# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

In re:                    )

                       )

SHANE CO.           )     Case No. 09-10367-HRT

                       )

EIN 84-0163760     )     Chapter 11

                       )

                       )

        Debtor,     )

                       )

---

## DISCLOSURE STATEMENT TO
## DEBTOR'S PLAN OF REORGANIZATION

---

Dated August 11, 2010

FAIRFIELD AND WOODS, P.C.
Caroline C. Fuller, #14403
Wells Fargo Centre
1700 Lincoln, Suite 2400
Denver, CO 80203-4524
Telephone: (303) 830-2400
Facsimile: (303) 830-1033
E-mail: cfuller@fwlaw.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Attn: Gregg M. Galardi, Esq.
Telephone: (302) 651-3000
Facsimile: (302) 651-3001

ATTORNEYS FOR SHANE CO.

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

       A.     REORGANIZATION AND DISCLOSURE ...................................................1
       B.     SUMMARY OF THE PLAN ...................................................................2
       C.     SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS ......2
       D.     VOTING ON THE PLAN ......................................................................5

II.    DESCRIPTION OF THE COMPANY .................................................. 5

       A.     HISTORY OF SHANE CO. ...................................................................5
       B.     CORPORATE STRUCTURE .................................................................6
       C.     FINANCIAL PERFORMANCE AND OTHER EVENTS PRECIPITATING
              BANKRUPTCY FILING ......................................................................7
       D.     EVENTS DURING BANKRUPTCY ......................................................10

III.   DESCRIPTION OF ASSETS ............................................................. 15

IV.    DESCRIPTION OF CLAIMS AND PROPOSED TREATMENT IN PLAN........... 16

       A.     PRIORITY CLAIMS ........................................................................16
              1.     Administrative Claims [Unclassified in the Plan]....................16
              2.     Pre-Petition Priority Claims ..................................................19
       B.     SECURED CLAIMS .........................................................................19
              1.     Suresh Claim [Class 2] ..........................................................19
              2.     Qwest Secured Claim [Class 3A].............................................19
              3.     Secured Tax Claims [Class 3B] ...............................................20
       C.     CONVENIENCE CLASS CLAIMS [Class 4] .......................................20
       D.     GENERAL UNSECURED CLAIMS [Class 5] .....................................20
       E.     TMS CLAIM [Class 6]......................................................................24
       F.     CONSIGNMENT CLAIMS [Class 7] .................................................25
       G.     EQUITY INTERESTS [Class 8] .......................................................25

V.     IMPLEMENTATION OF PLAN ........................................................ 25

       A.     VESTING OF ASSETS; PAYMENT OF CLAIMS .................................25
       B.     PLAN COMMITTEE .......................................................................26
       C.     FINANCIAL PROJECTIONS AND VALUATION .................................27
       D.     PROVISIONS GOVERNING DISTRIBUTIONS....................................29

       E.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
              LEASES ........................................................................................31

|   | F. | MANAGEMENT | 32 |
|   | G. | RETENTION OF PROFESSIONALS | 33 |
|   | H. | DISCHARGE | 33 |
|   | I. | RELEASES AND RELATED MATTERS | 33 |
|   | J. | PERMANENT INJUNCTION | 34 |
|   | K. | FINAL DECREE | 34 |
|   | L. | CONDITIONS PRECEDENT TO EFFECTIVE DATE | 35 |
|   | M. | SUBSTANTIAL CONSUMMATION | 35 |
|   | N. | WAIVER OF PREFERENCE ACTIONS; PRESERVATION OF OTHER CLAIMS | 35 |
|   | O. | RETENTION OF JURISDICTION | 36 |
|   | P. | MISCELLANEOUS | 36 |
| VI. |   | RISK FACTORS | 36 |
|   | A. | RISK FACTORS REGARDING THE COMPANY'S BUSINESS | 36 |
|   | B. | RISK FACTORS RELATING TO THE CHAPTER 11 CASE | 39 |
| VII. |   | COMPARISON WITH CHAPTER 7 LIQUIDATION | 41 |
|   | A. | INTRODUCTION | 41 |
|   | B. | SCOPE, INTENT, AND PURPOSE OF THE LIQUIDATION ANALYSIS | 42 |
|   | C. | GLOBAL ASSUMPTIONS IN THE LIQUIDATION ANALYSIS | 43 |
|   | D. | PRIMARY ASSETS OF THE COMPANY | 44 |
|   | E. | FORCED LIQUIDATION SALE PROCESS | 44 |
|   | F. | FACTORS CONSIDERED IN VALUING HYPOTHETICAL LIQUIDATION PROCEEDS | 45 |
| VIII. |   | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION | 45 |
|   | A. | LIQUIDATION UNDER CHAPTER 7 | 45 |
|   | B. | ALTERNATIVE PLAN(S) OF REORGANIZATION | 45 |
|   | C. | DISMISSAL OF THE BANKRUPTCY CASE | 46 |
| IX. |   | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 46 |
|   | A. | CONSEQUENCES TO THE COMPANY | 47 |
|   | B. | CANCELLATION OF DEBT INCOME | 47 |
|   | C. | CONSEQUENCES TO HOLDERS OF CLAIMS | 47 |
| X. |   | CONFIRMATION OF THE PLAN | 48 |
|   | A. | CONFIRMATION | 48 |
|   | B. | CONFIRMATION HEARING | 48 |

| | C. | REQUIREMENTS FOR CONFIRMATION OF THE PLAN –<br>CONSENSUAL CONFIRMATION ....................................................49 |
|---|---|---|
| | D. | BEST INTERESTS TEST.......................................................................50 |
| | E. | FEASIBILITY.........................................................................................51 |
| | F. | CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED<br>CLASSES:  THE "CRAM DOWN" ALTERNATIVE ................................51 |
| | G. | EFFECT OF CONFIRMATION .............................................................53 |
| | H. | FURTHER INFORMATION; ADDITIONAL COPIES ................................53 |

**XI.**  **VOTING** ......................................................................................................... 53

**XII.**  **RECOMMENDATION** ................................................................................. 55

# I.   INTRODUCTION

## A.   REORGANIZATION AND DISCLOSURE

On January 12, 2009, Shane Co., d/b/a Western Stone & Metal, ("Shane" or the "Company" or the "Debtor") filed its voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Code"). On August 10, 2010, 2010, Shane filed its Plan of Reorganization (the "Plan"), which accompanies this Disclosure Statement, to provide for the reorganization of its estate, and for the payment of the Claims of creditors.

The purpose of this Disclosure Statement is to provide the holders of Claims against and equity interests in Shane adequate information about the bankruptcy estate and the Plan to make an informed judgment about the merits of the Plan in connection with voting on the Plan. The Plan is the definitive, legally-binding document. *YOU ARE ENCOURAGED TO READ THE PLAN AND TO CONSULT WITH YOUR COUNSEL ABOUT IT.* This Disclosure Statement is meant to be helpful to you, but you should not rely on it alone. To the extent there is a conflict, the terms of the Plan control over any statement contained in this Disclosure Statement. Certain capitalized terms used in this document are defined in the Plan. Other capitalized terms may be defined in the Bankruptcy Code.

This Disclosure Statement has neither been approved nor disapproved by either the Securities and Exchange Commission ("SEC") or the United States Trustee ("US Trustee"), and neither the SEC nor the US Trustee has passed upon the accuracy or adequacy of any statements contained in this document. In addition, approval of this Disclosure Statement by the Bankruptcy Court does not constitute or imply approval by the Court of the Plan.

## B.    SUMMARY OF THE PLAN

The Company owns and operates twenty upscale retail jewelry stores in thirteen states, and also maintains an internet retail store. It currently employs approximately 575 employees. As with many retailers, the 2008 economic downturn and continued recession had a substantial, negative, impact on its revenues. That decline in sales, combined with certain expansion costs and other business developments, discussed in greater detail below, caused certain covenant defaults under the Company's loans with its primary secured lenders. To avoid the declaration of defaults under those loans, which might have resulted in the immediate and complete liquidation of the Company, the Company elected to file this Chapter 11 Case to preserve its going concern value and to propose a plan for repayment of its creditors, over time.

The Plan calls for the continued operations of the Company, and for the payment in full of loans secured by certain assets of the Company, over time, as agreed to by the secured lenders and the Company. It also calls for distributions to creditors holding general unsecured claims over time, from available revenues of the Company (other than a convenience class of claims of $7,5000 or less which will be paid promptly after Confirmation of the Plan), which will continue, with certain limited exceptions, until the principal amount of all allowed general unsecured claims has been paid in full. It further calls for the grant of a junior security interest in the inventory of the Company to secure a portion of the outstanding obligations to the general unsecured creditors. Thomas M. Shane, the President, Chief Executive Officer, Director, and major shareholder of the Company, has, directly and indirectly, made loans to the Company in excess of $30 million. Mr. Shane has agreed to defer the repayment of the principal obligations on a $10.5 million debtor-in-possession loan which he made through an affiliated entity, Corundum (which loan is secured by a senior lien on all inventory of the Company); all payments on account of $20 million in unsecured loans he made prior to the bankruptcy filing; and all payments on account of certain other claims which he holds against the Company totaling approximately $3 million, until all payments are made to the general unsecured creditors. In addition, Mr. Shane has agreed to loan to the Company fifty percent of personal federal income tax refunds he has received and may collect in the future on account of net operating losses of the Company, to help fund the obligations under the Plan, which loans will also be secured by a senior lien on inventory of the Company. The Plan provides that Mr. Shane and various family trusts will retain their current ownership interests in the Company.

## C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| None | Administrative Expense Claims | Cash in an amount equal to such Allowed Administrative Expense on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date and (ii) the date on which such Expense becomes Allowed | No | 100% |

2

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| None | Priority Unsecured Tax Claims | Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date and (ii) the date on which such Claim becomes Allowed | No | 100% |
| None | Professional Fee Claims | Cash in an amount equal to such Allowed Professional Fee on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date and (ii) the date on which such Professional Fee becomes Allowed | No | 100% |
| None | U.S. Trustee Fees | Outstanding U.S. Trustee Fees incurred by the Estate prior to the Effective Date shall be paid by the Company on the Initial Distribution Date in accordance with the applicable schedule for payment of such fees. Until the Case is closed by entry of a final decree by the Court, the Company shall pay all U.S. Trustee Fees on account of distributions made pursuant to the Plan in accordance with applicable schedules. | No | 100% |
| None | Corundum Claim | The Corundum DIP Loan will be restructured upon the Effective Date into a term loan. Interest will be paid at the rate of 11% per annum on a monthly basis. Repayment of principal will be deferred until the earlier of (a) repayment in full of the principal amount of the Class 5 Claims, plus such interest on those Claims as is provided for in the Plan; or (b) ten years after the Effective Date; at which time the Corundum Claim will mature. Corundum will retain its senior lien on inventory until the Corundum loan has been fully repaid. Any additional Tax Share Amount Advances made through the Corundum facility will be secured by inventory, as well, but will be repaid as if they were Class 6 Claims, except in the event of a Liquidation. | No | 100% |
| I | Priority Non- | Cash in an amount equal to such Allowed | No | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| | Tax Claims | Priority Claim on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date and (ii) the date on which such Claim becomes Allowed | | |
| 2 | M. Suresh Secured Claim | Interest will continue to accrue at the rate of 11% per annum until paid in full. The Allowed Claim will be paid in weekly installments of $125,000, with any outstanding balance thereon to be paid on or before December 31, 2010. M. Suresh shall retain its lien on assets of the Company until its Allowed Claim is paid in full. | Yes | 100% |
| 3A | Qwest Secured Claim | To be paid pursuant to terms of Settlement Agreement between Qwest and Company | No | 100% |
| 3B | Secured Tax Claims | Cash in an amount equal to such Allowed Secured Tax Claim on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date and (ii) the date on which such Claim becomes Allowed | No | 100% |
| 4 | Convenience Class Claims | Cash in an amount equal to such Allowed Claim on or as soon as practicable after the latest of (i) the Initial Distribution Date (ii) January 31, 2011, and (iii) the date on which such Claim becomes Allowed | Yes | 100% (without interest) |
| 5 | General Unsecured Claims | To be paid from available revenues of the Company, over time, with interest to accrue and be paid under certain limited circumstances. To the extent funds are available, the Debtor may implement the Early Payment Discount Election Procedure to allow unsecured creditors to elect to receive a discounted prepayment of their Allowed Claims, in whole or in part. | Yes | 100% (without interest except in certain limited circumstances) |
| 6 | TMS Claim | Repayment of the TMS Claim shall be deferred pending payment in full of the Allowed Class 5 Claims. Interest may accrue on the TMS Claim at their contract rate, but payment of interest shall also be | Yes | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| | | deferred.  In the event of a Liquidation of the Company, after payment of all secured claims (including any Tax Share Amount Advances made through the Corundum facility), the TMS Claim, capped at the current outstanding amount of $22,779,021, will share with Class 5 Creditors and any other unsecured creditors of the Company, on a *pari passu* basis, in the proceeds of Liquidation. | | |
| 7 | Consignment Claims | To be Reinstated and paid pursuant to the consignment agreements between the creditor and the Company | No | 100% |
| 8 | Equity Interests | Unaffected by the Plan. | No | N/A |

### D.     VOTING ON THE PLAN

The Company can implement the Plan only if it is confirmed by the Bankruptcy Court. Classes 2, 4, 5, and 6 are impaired and are entitled to vote on the Plan.  When confirmed, the Plan is binding on the Company, its creditors, and interest holders, whether or not they voted in favor of the Plan.

The Court has scheduled a hearing on Confirmation of the Plan for _____, **2010,** at _____ ____.**m.,** at the United States Bankruptcy Court for the District of Colorado, 721 19th Street, Fifth Floor, Courtroom B, Denver, Colorado.  At that time, the Court will, among other things, determine whether the Plan meets the standards for Confirmation set forth in the Bankruptcy Code.  The Bankruptcy Court has fixed _____, **2010** as the deadline for submission of ballots in connection with the Plan, and for filing objections to confirmation of the Plan.  Detailed instructions regarding voting on the Plan are in Section XI of this Disclosure Statement.

### II.     DESCRIPTION OF THE COMPANY

### A.     HISTORY OF SHANE CO.

The Company was founded in 1971 in Denver, Colorado by Thomas M. ("Tom") Shane, who is the third generation Shane in the retail jewelry business.  The Company is one of the largest retail jewelers in the U.S. and currently operates 20 upscale retail jewelry stores in 15 U.S. markets in 13 different states.  The Company operates single stores in Indianapolis, Kansas City, Louisville, Nashville, Phoenix, Portland, Sacramento, St. Louis, Seattle, and Salt Lake City.  It operates multiple stores in Atlanta (3), Denver (2), Minneapolis/St. Paul (2) and San

Francisco (3).  It also operates an Internet retail store through its website, www.shaneco.com. Company stores are typically free-standing buildings measured 9,000 to 11,000 square feet.  All store locations are leased.

Known foremost as a diamond retailer, Company stores feature a broad selection of loose diamonds and bridal jewelry.  The Company also sells fine rings, earrings, bracelets, necklaces and pendants featuring diamonds, rubies, sapphires and pearls set in 14-karat and 18-karat white and yellow gold and platinum; and men's accessories.  The Company targets engagement and bridal customers and other fine jewelry shoppers in urban and suburban markets.  The Company developed market share as the value leader, offering the largest selection of loose diamonds and wedding/bridal jewelry in the market, at competitive prices; through consistent marketing to attract new customers; and attentive customer service that builds repeat business.  The Company has long-standing relationships with key suppliers in Antwerp, Tel Aviv, Bangkok, Mumbai, and Hong Kong, and other domestic and international locations.  The Company believes that it has top market share of bridal jewelry sales in each of its markets.  The Company maintains a heavy media presence in each market, using institutional marketing (not sales promotional marketing) to drive traffic to its stores and to reinforce its image as the consumer's best destination store for fine jewelry.

The Company has a total of approximately 575 employees.  Approximately eighty percent of the employees are located in the retail outlets; the remainder of the employees work in the corporate headquarters.  The Company hires additional seasonal staff during key holiday periods.  All sales employees are salaried or hourly; none work on a commission basis, but a store-wide self-funding incentive program is in place in each location to incentivize the sales force.

## B.    CORPORATE STRUCTURE

The Company is a closely held Subchapter S corporation, with all stock owned by Tom Shane and various of his family's trusts.  In 2007, the Company formed Shane Co. (Thailand) Ltd. ("SCT"), which leases and operates a facility in Bangkok.  The Company owns over 99% of the stock of SCT.  Due to the unique requirements of Thai law, a total of seven individual Shane family members and other insiders own nominal stock interests in SCT.  SCT is a captive subsidiary, currently providing certain limited services exclusively to the Company, including sourcing, manufacturing, and quality control, at a much lower overhead cost, by multi-generational, specially trained staff.

Tom Shane serves as President and Chief Executive Officer of the Company.  His son, Rordan Shane, is Executive Vice President.  Other key offices are held by Bill Richins, Executive Vice President and Chief Administrative Officer; and Scott Danitz, Chief Financial Officer, Secretary, and Treasurer.  The directors of the Company are Tom Shane, his brother, Jon Shane, who is the trustee of trusts who hold equity interests in the Company, his daughter, Kelsey B. Shane, and Rordan Shane.

6

## C.  FINANCIAL PERFORMANCE AND OTHER EVENTS PRECIPITATING BANKRUPTCY FILING

*Impact of Economic Recession*

The single largest factor causing the bankruptcy filing by the Company was the precipitous decline in retail sales, particularly in luxury goods, driven by the overall economic recession starting in the fall of 2008. As with many jewelry retailers, the holiday period of Thanksgiving through Christmas historically represents approximately 30 to 37% of the Company's overall sales. In 2008, the Company's sales during this period were off 37% from 2007's numbers, itself a slow holiday season, with recession looming.

In its 2005 fiscal year, the Company reached $157 million in annual net sales. By its 2007 fiscal year, its total net sales were $266 million. In the 2008 fiscal year, net sales were $276 million. In contrast, in its 2009 fiscal year (which ended January, 2009), its total net sales were only $212 million. For its 2010 fiscal year (ending January, 2010), the Company realized total net sales of $166 million. The Company projects total sales for its 2011 fiscal year (ending January, 2011) of $212 million. Actual sales for fiscal year 2011, from January 31, 2010 through June 26, 2010, are $77 million.

*Expansion and Capital Expenditures*

Beginning in 2006, the Company pursued expansion opportunities to open five new stores in four new markets which the Company believed had significant promise. The market downturn and other factors made opening stores in certain of these locations, in hindsight, ill-advised. The Company opened three of the five planned stores in 2007, but in May of 2008 and February 2009, closed two of these stores. The Company never built two of the locations. One of these three remains open today. In addition, the Company elected to close three additional stores in three separate markets between 2008 and 2009. Two of these three stores were in cities where the Company currently has operating stores, and the Company was able to successfully transfer much of its business to its remaining locations. .

In addition, the Company elected not to move into planned expanded corporate offices in favor of a relocation to smaller corporate headquarters, which it currently occupies. Despite savings realized as a result of the store closings and the decision not to move into new corporate offices, the Company remained liable for lease obligations on five empty leasehold locations. The Company aggressively attempted to sublease the vacant stores and unoccupied corporate headquarters, with limited success. Until the Petition Date, the Company continued to service the lease obligations, resulting in a drain on cash flow.

In 2006, the Company created Shane Co. (Thailand) Ltd. to serve as a partial sourcing, manufacturing, and quality control facility in Bangkok, in order to take advantage of the lower cost of labor, and reap the rewards of the mastery of certain jewelry techniques of Thai craftspeople. The costs of construction of the facility and other start-up costs, totaling approximately $4.7 million in 2007 and 2008, were a further drain on capital.

Finally, in 2005, the Company engaged consultants to develop a highly sophisticated Enterprise Resource Planning (ERP) system, to serve as an enterprise-wide information technology system, as its legacy computer system was nearing its natural lifecycle. The consultants worked with SAP, one of the leading developers of ERP systems, to design and implement the ERP system. The original cost of the ERP system was quoted to have been $8 to $10 million, with a ten to twelve-month implementation schedule. That cost ballooned to $36 million, with a 32-month implementation schedule. During the process, the Company terminated several of its consultants and began working directly with SAP to resolve design and implementation issues. The system went "live" in the fall of 2007, but functionality issues remained well into 2009. While the Company and SAP have worked closely together to address the operational and implementation issues that have occurred, the lack of a fully functional ERP system hindered the Company's operations through the 2007 holiday season. The Company believes that its 2007 and 2008 holiday sales were adversely affected due to residual issues with the ERP system.

Due to the delay in completion of the ERP system, and the lack of reliable inventory numbers in 2007 and 2008, the Company was substantially overstocked with inventory in total, under stocked in some vital areas of inventory, and the wrong mix of inventory, which added to the Company's cost of capital and also adversely affected sales through 2007 and 2008. In mid-2009, the Company finally began receiving the detailed inventory reports it required to identify remaining inventory overstock and gaps in inventory, and to develop a plan for adjusting its inventory levels to optimize sales. The Company has implemented these plans over months, to avoid significant losses that would be realized if the Company attempted to dispose of excess inventory through immediate liquidations.

*Financing*

While the Company had historically paid cash for all inventory, beginning in 2006, due in part to capital constraints, the Company began purchasing inventory on trade credit. Vendors typically provided inventory both on thirty-to-sixty day trade terms, and also on consignment terms.

In addition, the Company arranged loan facilities with Crystal Capital Fund, L.P. and SunTrust Bank, in 2006, to facilitate inventory purchases and provide working capital, totaling $75 million. By the fall of 2008, the principal obligations and available lines under these facilities had been reduced to $40 million. The cost of the financing facilities, both interest and compliance obligations thereunder, added to the cash drain on the Company.

*Restructure and Refinance Efforts*

In 2004, the Company first retained SunTrust Robinson Humphrey, an investment banking firm, to consider sale, merger, and capital options for the Company. That engagement was renewed in late 2007, focused on raising additional working capital for the Company. In 2007 and 2008, the Company also brought in turnaround specialists Cloyses Partners and FTI Consulting, to assist in analyzing and restructuring the Company's financial and business

operations. The Company first "right sized" the central office and store operations, eliminating over 38 positions in the central office, and 68 positions at the store level, in September and December 2007. Immediately pre-petition, the Company terminated a total of 71 employees in the central office and retail locations. While the Company was able to restructure its corporate operations and reduce its operating overhead, it was unable to secure a new investor or lender willing to refinance its existing obligations.

Mr. Shane has been approached on occasion to explore possible business options including mergers, recapitalizations, and new equity investors in the Company. While Mr. Shane has been open to these opportunities, no firm offers have been presented. In 2008, the Company, with the assistance of FTI Consulting, was in discussions with various private equity firms and private investors, to explore recapitalization and possible sale options. None of those discussions bore fruit.

During the spring and summer of 2008, Mr. Shane reached out to the Company's critical vendors per a mandate of its lender, Crystal Capital, and sought extended payment terms and extended credit lines, which were generally granted, thereby obtaining significant payment and credit relief. As a result, in September of 2008, SunTrust and Crystal provided a one year refinancing of their existing loans, at a time when financing was very difficult to secure. In addition, in the fall of 2008, the Company entered into a Supply Agreement with a merchandise vendor, M. Suresh, which agreed to provide inventory on extended terms in exchange for a junior security interest on the Company's assets. Despite the extension of these credit lines in September, by December of 2008, the Company was facing covenant defaults with SunTrust and Crystal, driven primarily by reduced sales and the impact of the 2008 recession.

Immediately prior to the bankruptcy filing, Mr. Shane contacted key suppliers, seeking to line up a consortium of supportive creditors to purchase the Crystal Capital facility, or to make a loan to the Company, funded as a DIP facility through a Chapter 11 reorganization, with the proceeds to be used to retire the obligations to Crystal Capital. While several vendors expressed some interest in participating in such a facility, it became apparent, through those discussions, that it was not possible that the Company would be able to come to terms regarding such a loan within the time-frame required by Crystal Capital. While the Company was able to retire the principal obligations to SunTrust at the end of 2008, from the proceeds of the liquidation of excess inventory and holiday sales, a $15 million obligation to Crystal Capital remained outstanding. Despite the fact that the Crystal Capital loan was secured by a first lien on some $75 million in inventory, valued at cost, together with all other assets of the Company, Crystal Capital placed significant pressure on the Company to begin liquidating its inventory in order to retire the Crystal Capital loan. Such a liquidation would have put the Company effectively out of business. The Company concluded it had no alternative but to reorganize its financial affairs through Chapter 11. The Company filed its bankruptcy petition on January 12, 2009.

## D.    EVENTS DURING BANKRUPTCY

*Appointment of Creditors Committee*

On January 22, 2009, the United States Trustee, a division of the Department of Justice which monitors bankruptcy cases, ordered the appointment of an Unsecured Creditors Committee (the "Committee") to represent the interests of all general unsecured creditors holding claims against the Company.  The Committee is composed of the following members:

| | |
|---|---|
| Milan Mehta<br>Dison Gems, Inc.<br>415 Madison Ave., #800<br>New York, NY 10017<br>(212) 921-4122 | Harsh Mehta<br>Eurostar Belgium Inc.<br>589 Fifth Avenue #910<br>New York, NY 10017<br>(212) 754-4100 |
| Katie Holloway<br>Clear Channel Radio<br>200 East Basse Road<br>San Antonio, TX 78209<br>(210) 832-3459 | Ann Arnold<br>Liberfarb, Inc.<br>48 S. Day St.<br>Orange, NJ 07050<br>(973) 676-9090 |
| Dominick Venditto<br>Novell Enterprises, Inc.<br>2100 Felver Court<br>Rahway, NJ 07065<br>(732) 428-3800 | Kenneth Wilson<br>Nelson Jewellery Arts Co., Ltd.<br>631 South Olive Street,  Suite 300<br>Los Angeles, CA 90014<br>(770) 642-6737 |
| Jay Weinblatt<br>Leo Schachter Diamonds, LLC<br>579 Fifth Avenue<br>New York, NY 10017<br>(212) 688-2000 | |

The Committee retained Joseph M. Vann and Robert Boghosian of the New York law firm Cohen Tauber Spievack & Wagner, P.C. ("Cohen Tauber"), and Christopher L. Richardson of the Denver law firm of Davis, Graham & Stubbs ("Davis, Graham") as its counsel.  The Committee has also retained Christopher Ellis and Mark Lenz of Consensus Advisory Services, LLC ("Consensus") as its financial advisors.

*DIP Financing*

The single most significant event during the bankruptcy case has been the procurement of a $10.5 million loan facility (the "DIP Loan") from Corundum Financial Ventures LLC, a

Colorado limited liability company (the "<u>DIP Lender</u>"), an entity formed by Thomas M. Shane and certain Shane family trusts. The proceeds of this facility were used, along with cash on hand at the Company, to repay the Crystal Capital facility in full in the first two weeks of the bankruptcy case. The elimination of the Crystal facility and the provision of a DIP Loan by insiders fully supportive of the Company's reorganization has allowed the Company and its management to focus on business operations, and negotiation of terms of a reorganization plan with the key creditor constituencies, rather than engaging in a battle with its primary secured lender over the fate of the Company.

During the reorganization process, the Company is making monthly interest payments on the DIP Loan. The DIP Loan will be restructured and repaid, over time, through the provisions of the Plan. The DIP Loan is secured by a senior lien on the inventory of the Company. Pursuant to the terms of the final order approving the DIP Loan, the Creditors Committee, and any other interested party, were given until December 31, 2009, within which to identify and assert any causes of action against Tom Shane, family members involved with the Company, and family trusts that hold stock in the Company. By agreement, the deadline within which the Creditors Committee may assert such a cause of action has been extended by the insiders several times. The time period within which any other interested party might assert any cause of action has expired.

*Cash Collateral*

When the bankruptcy case was filed, SunTrust retained small claims for outstanding fees and costs, and Crystal Capital held a secured claim in the amount of $15 million, plus additional fees and costs. While the proceeds of the DIP Loan were used to retire these pre-bankruptcy secured loans in full, the Company engaged in extensive negotiations with SunTrust and Crystal Capital regarding the terms of the use of cash collateral for the one-week time period in which revenues of the Company, in which these lenders claimed an interest, were used for business operations, before SunTrust and Crystal Capital were repaid in full. Those negotiations resulted in a comprehensive cash collateral order which authorized the continued use of cash collateral, respecting the relative lien priorities of the existing lenders. Under its loan agreements with the lenders, the Company agreed to indemnify them against any claims that might be asserted against them by third parties. The lenders refused to release their security interests while there was any chance that either the Company, or a creditor acting on its behalf, or a third party, might assert any claims against them. Thus, the cash collateral order also imposed a deadline within which the Creditors Committee, or any other party in interest, might assert a challenge to the claims of these lenders, or to assert any claims or causes of action against them. Those time periods have now expired, and the security interests of SunTrust and Crystal Capital in the assets of the Company have been released.

*Other First Day Motions*

The Company secured entry of a number of orders to facilitate ongoing business operations in the early days of the bankruptcy case. The Court authorized the Company's payment of any outstanding pre-petition wages due to its employees, and the continuation of

employee benefit programs. The Court authorized the payment of pre-petition sales and use taxes, and other similar trust fund taxes. The Court authorized a program for the payment of security deposits to utilities to preclude them from shutting off services to the Company's locations. The Court authorized the continuance of existing liability and comprehensive insurance policies maintained by the Company on its assets and operations, the payment of all premiums related thereto, and the payment of related broker's fees. The Company filed a motion to reject real property leases for its closed and vacant locations, and miscellaneous contracts related to those locations.

*Customer Satisfaction Programs*

As a part of all merchandise sales, the Company provides a 60-day cash-back or exchange guaranty, lifetime warranties, and an upgrade program allowing any customer to return most jewelry, receiving full credit for the purchase price paid toward the purchase of a more expensive piece of jewelry. The Company sells gift cards to customers, and provides a layaway program for customers to make merchandise purchases over time. These programs are designed to develop customer loyalty and repeat purchases. The Company secured Court authorization to continue these programs uninterrupted, and to refund layaway deposits in those circumstances where the customer was not interested in receipt of a store credit to apply toward other merchandise.

*Real Property Leases*

As of the commencement of the bankruptcy case, the Company maintained twenty-three retail stores, plus its corporate home office. Early in the bankruptcy case, the Company decided to close three under-performing locations immediately after Valentine's Day. The Company secured entry of an order authorizing the closing of those stores and the rejection of the leases for those locations – 4194 Conroy Road, Orlando, Florida; 1950 Mount Zion Road, Morrow, Georgia; and 17950 Southcenter Parkway, Tukwila, Washington. The Company also rejected the leases for those locations that were closed pre-petition, or had never been occupied.

Under the Bankruptcy Code, a debtor is given a total of only seven months to decide whether to assume or reject leases of real property. Unless a lessor consents to a further extension, any lease not assumed at the end of the seven-month period is deemed rejected, and the debtor is obligated to vacate the leasehold premises. While most of the Company's lessors agreed to give the Company an extended period of time, most typically to confirmation of the Plan, to assume or reject leases, a handful of the lessors required the assumption of their leases on earlier dates. Thus, as of the filing of the Plan, the Company has secured entries of orders for the assumption of the leases for the following locations: 690 Concar Drive, San Mateo, California; 9730 S.W. Cascade Avenue, Tigard, Oregon; 6550 W. 104th Avenue, Westminster, Colorado; Brentwood Promenade, Brentwood, Missouri; 7144 E. Acoma Drive, Scottsdale, Arizona; and the corporate headquarters located at 8085 S. Chester Street, Centennial, Colorado. The Plan calls for the assumption of the remaining retail leases, and the payment of any cure amounts due thereunder as of the Plan Effective Date.

12

Given the decline in the commercial real estate market, the Company engaged Jeffrey A. Klein as special counsel to assist in the review and possible renegotiation of the terms of all of the Company's leases. Mr. Klein successfully renegotiated the terms of most of the Company's remaining leases, resulting in annualized rent savings of approximately $2 million, total rent savings of approximately $6 million, and improvement in various other terms and conditions, including early termination rights. Some of the revised terms go into effect only upon the Company's assumption of the lease or upon confirmation of the Plan.

*Claims*

The Court approved a procedure recommended by the Company for the reconciliation of reclamation claims asserted by vendors providing goods to the Company within forty-five days prior to the bankruptcy filing, and priority claims for vendors providing goods to the Company within twenty days prior to the bankruptcy filing under Section 503(b)(9) of the Bankruptcy Code. The Company completed the reconciliation process, concluding that vendors were entitled to reclamation and 503(b)(9) claims totaling approximately $1.2 million. Those claims were granted administrative priority status and were paid in full by the Company in October, 2009.

The Court set a general bar date for filing claims against the Company of June 29, 2009 for all creditors other than governmental entities, and of July 13, 2009 for claims of governmental entities. Only those creditors whose claims were not listed, or were listed as contingent, disputed, or unliquidated, in the Debtor's bankruptcy schedules, or where the proper amount of the claim was subject to disagreement, were required to file proofs of claim. Under the bar date order, creditors whose claims arise from the rejection of an unexpired lease or executory contract have until the later of the original bar date, or thirty days after entry of the order authorizing the rejection of the contract or lease, to file a claim arising out of the rejection. Similarly, if the Company amends its schedules to change the manner in which a creditor's claim is scheduled, the creditor has until the later of the original bar date, or thirty days after notice of the amendment, to file a proof of claim.

The Company is in the process of reviewing and reconciling all filed claims against the Company's records of amounts due. Objections will be filed as appropriate. The Plan provides that the Company will file all claims objections no later than ten days prior to the deadline established by the Court for voting on the Plan.

*Inventory Analysis and Right-Sizing*

One of the problems hindering the Company's operations pre-petition was the lack of completion of the ERP system which the Company began implementing in 2007. A primary deficiency was the system's inability to generate detailed inventory reports, so the Company could clearly analyze inventory gaps and overstocks, and prepare a plan for addressing the deficiencies. Finally, in the summer and fall of 2009, the Company was capable of generating reports with the level of detail required to complete the inventory analysis. As a result, the Company identified and began filling significant inventory gaps, and identified excess inventory. The Company has developed a plan for the orderly disposition of the excess inventory in a

manner designed to realize its highest value. The Company continues to analyze its inventory needs, making adjustments as necessary to maximize sales.

*Sales*

From a sales high of $276 million in fiscal year 2008, the Company's sales volume dropped dramatically as the country moved into an economic recession in 2008 and 2009. In the Company's 2009 fiscal year (ending January, 2009), its total sales were only $212 million. For its 2010 fiscal year (ending January, 2010), the Company realized total sales of $166 million. Part of the decline in sales volume was attributed to the closing of several retail locations pre-petition and post-petition, but comparable sales per store have also declined as consumers limit their discretionary spending. The Company has significantly reduced its corporate overhead and marketing expense to compensate for its decrease in sales.

As of the filing of this Disclosure Statement, the Company is currently forecasting realize net sales of $212 million for its 2011 fiscal year (ending January, 2011), an approximately 28% increase over its 2010 fiscal year. The Company continues to analyze methods by which it may increase its revenues, and reduce its operating expenses, in order to preserve the core value of the business while maximizing, to the extent possible, the Company's ability to retire its remaining obligations.

*Committee Investigation*

The Committee is charged with representing and protecting the interests of the general unsecured creditors. One of the tasks typically undertaken by a creditors committee, particularly where a debtor is closely held, rather than a public company, is a review of transactions between the Company's shareholders and senior management and the Company. Similarly, creditors committees frequently analyze key business transactions, particularly where disputes exist, in order to determine whether claims exist that should be pursued for the benefit of creditors generally.

The order approving the DIP financing imposed a deadline of December 31, 2009, within which any challenge might be brought to any transactions between Tom Shane, members of his family, or other insiders of the Company, and the Company. That deadline was subsequently extended several times by agreement between the Committee and the insiders. The Committee sought substantial discovery from the Company and from Mr. Shane regarding their financial relationships. Thousands of pages of documents have been produced by the Company and the insiders in response to the Committee's requests. The Company is confident that no claims against its insiders exist, particularly under circumstances where Mr. Shane has loaned millions of dollars to the Company, including the DIP financing provided through Corundum which was crucial to the Company's survival. The Plan provides for a complete release of any such claims.

Similarly, the Committee scrutinized key business transactions between the Company and third parties, and determined that no further claims beyond those already pursued and

recovered by the Company existed that should be pursued for the benefit of the creditors, given the proposed full payment to the general unsecured creditors contemplated in the Plan.

*Retention of Professionals*

As noted above, the Committee has retained two law firms and financial advisors to represent it during this bankruptcy case.  The Company retained Caroline C. Fuller and the firm of Fairfield and Woods, P.C. ("Fairfield and Woods") as its general bankruptcy counsel.  The firm was general corporate counsel to the Company prior to its bankruptcy filing.  The Company also retained Gregg Galardi of Skadden, Arps, Slate, Meagher, & Flom, LLC ("Skadden Arps") as special restructuring counsel.  The Company has consulted with Mr. Galardi and his associates on an as-needed basis related to the Chapter 11 Case.  The Company has retained, as special counsel, Jeffrey A. Klein ("Klein"), to handle lease negotiations; and Shannon Henderson of Hale, Friesen, LLP ("Hale Friesen") as special employment counsel.  The Company has retained the firm of Caler, Donten, Levine, Porter, & Veil, P.A. ("Caler Donten"), as its accountants, and is in the process of retaining GHP Horwath, P.C., to take over accounting matters for the Company.   Finally, the Company had retained the firm of FTI Consulting, Inc. ("FTI"), pre-petition, at the insistence of Crystal Capital and SunTrust, as restructuring and financial advisors.  Kevin Regan of FTI held the office of Chief Restructuring Officer during most of 2008, and until satisfaction of the obligations due to Crystal Capital and SunTrust.  At that time, the Company terminated its relationship with FTI, and Mr. Regan resigned as Chief Restructuring Officer.  The Company is in the process of transitioning its accounting work from Caler Donten, based in Florida, to GHP Horwath, which has offices in the Denver metro area.

*Financial Statements*

Attached hereto as **Exhibit A** are the Company's summary, unaudited financial statements for its 2009 and 2010 fiscal years.

## III.   DESCRIPTION OF ASSETS

The Company's primary asset is its inventory.  As of June 26, 2010 (the last day of the fiscal month), the Company had inventory on hand, valued at FIFO cost of approximately $60.5 million.  The Company also has twenty retail leases plus the lease of its corporate headquarters.  The value of these leases is unknown at this time.   The Company has furniture, fixtures, leasehold improvements, and equipment in its various locations, valued at net book value, as of June 26, 2010, less depreciation, of approximately $28.0 million.  The Company also has trade marks, trade names, software licenses, and other intellectual property and other intangible assets, with no recorded book cost and the value of which is unknown at this time.   The Company has no meaningful accounts receivable or causes of action.

## IV.   DESCRIPTION OF CLAIMS AND PROPOSED TREATMENT IN PLAN

### A.   PRIORITY CLAIMS

1.   *Administrative Claims* [Unclassified in the Plan]

(A)   Professional Fees

Under Section 507(a)(1) of the Bankruptcy Code, professionals who provide services to the estate during a bankruptcy case are entitled to priority repayment of their fees and expenses. Thus attorneys, accountants, and other professionals retained by the Company or the Committee are entitled to payment in full of their fees and expenses, as allowed by the Bankruptcy Court, before any distributions are made to the general creditors. Pursuant to an interim fee procedure approved by the Court, each of the firms has been paid 75% of fees, and 100% of expenses incurred, on a monthly basis, pending submission of fee applications every four months. By agreement with the Committee, Klein, Caler Donten, and GHP have been excluded from the interim fee process.

Prior to the bankruptcy filing, the Company paid retainers to Fairfield and Woods, Skadden, Arps, and FTI, except $56,584. Upon termination of its services, FTI returned the unused portion of its retainer. Fairfield and Woods and Skadden, Arps have applied their retainers to pre-petition fees and costs, and post-petition fees and costs in accordance with the interim fee procedure.

From the Petition Date of January 12, 2009, through June 26, 2010, the professionals had been paid, and held accrued and unpaid fees, after application of retainers and prior payments, for invoices for services rendered, in the following amounts:

| Professional | Amounts paid from January 12, 2009 through June 26, 2010 | Accrued but Unpaid Amounts through June 26, 2010 |
|---|---|---|
| Fairfield and Woods | $421,088.00 | $0.00 |
| Skadden, Arps[1] | $23,485.00 | $36,689.00 |
| Hale, Friesen | $29,538.00 | $5,017.00 |
| Klein | $203,806.00 | $40,023.00 |
| Caler Donten | $0.00 | $28,165.00 |
| FTI | $73,416.00 | $0.00 |
| GHP | $2,850.00 | $0.00 |
| Cohen, Tauber | $489,484.00 | $43,141.00 |
| Davis, Graham | $58,508.00 | $0.00 |

---

[1]   Skadden Arps holds a retainer with a current balance of $335,580, which will be applied against the accrued but unpaid fees. Other than FTI, which continues to hold a retainer of $56,584 that will be refunded to the Company net of any professional fees that may be incurred through confirmation, no other professionals currently hold any retainers.

| Professional | Amounts paid from January 12, 2009 through June 26, 2010 | Accrued but Unpaid Amounts through June 26, 2010 |
|---|---|---|
| Consensus | $291,155.00 | $1,345.00 |

The Company estimates that these professionals will be due additional professional fees and expenses, after payments pursuant to the interim fee procedure and application of retainers held, as of the Effective Date of the Plan totaling approximately $500,000:

(B)    Expenses of Administering the Estate

As with professional fees, debts incurred in connection with the administration of this case are entitled to priority repayment under Section 507(a)(1) of the Code. To the best of its knowledge, the Company has paid all of its post-petition operating expenses as they have come due during the bankruptcy case. Thus, Company anticipates that the only obligations outstanding as of the Effective Date of the Plan will be its current accounts payable, which it will pay in the ordinary course of business.

(C)    Cure Costs

Under the Bankruptcy Code, the Company must pay the costs to cure pre-petition defaults under any unexpired lease or executory contract which is to be assumed under the Plan. As a part of the Plan Supplement to be filed no later than thirty (30) days prior to the date set for the Confirmation Hearing, the Company will file its Schedule 7.1 – Schedule of Executory Contracts to be Assumed, and Cure Costs; and its Schedule 7.4 – Schedule of Executory Contracts to be Rejected. Notice of the filing of the Plan Supplement, and of the deadline within which any party in interest may object to the assumption of its Executory Contract, or to the amount of the Cure Costs, will be provided to all parties to Executory Contracts. Unless the parties agree to different treatment, each of the Cure Costs will be paid in full on the Effective Date. To the extent the amount of the Cure Cost is in dispute, the Company will maintain funds on deposit in the Disputed Claims Reserve established under the Plan until the dispute is resolved.

(D)    Quarterly Fees

Quarterly fees required to be paid by the Company to the Department of Justice in accordance with 28 U.S.C. Section 1930 are entitled to priority. The Company believes all quarterly fees have been paid when due. Any accrued but unpaid quarterly fees outstanding as of the Effective Date of the Plan will be paid on that date.

Quarterly fees continue to accrue and be due and payable after confirmation of the Plan, on account of distributions to pre-petition creditors whose claims are paid pursuant to the Plan, until the bankruptcy case is dismissed, converted, or closed. Quarterly fees are based upon the amount of disbursements made by the Company in each quarter, and have been at the maximum

of $30,000 per quarter. The Company projects that its case will be closed promptly after making the initial distributions to creditors pursuant to the terms of the Plan.

(E)     Reclamation and 503(b)(9) Claims

As discussed above, the Company, with Court authorization, established a procedure for the determination of valid reclamation claims against the estate, including claims entitled to administrative priority treatment pursuant to Section 503(b)(9) of the Bankruptcy Code. The Company sought Court authorization to pay these claims in advance of confirmation of the Plan, which was granted, and all of those claims have been paid in full.

(F)     Corundum Claim

Corundum provided DIP Financing to the Company in the amount of $10,500,000. Interest has been paid on a current basis, during the bankruptcy case, at the rate of 11% per annum. While Corundum is entitled to demand payment in full of the DIP Loan on the Effective Date of the Plan, Corundum has agreed to the restructure of its loan under the Plan.

Under the Plan, the Company will execute the Corundum Exit Loan Documents, which are attached to the Plan as Exhibit 2. Pursuant to those loan documents, Corundum will continue to be paid interest at the rate of 11% per annum, on a monthly basis, but will defer repayment of any principal until the earlier of (i) payment in full of the Class 5 Claim Amount, described below, and (ii) the date that is ten (10) years after the Plan Effective Date; at which time the Corundum Claim will mature and be due and payable in full. Corundum shall retain its senior lien on all inventory of the Company until the Corundum Claim has been paid in full. In addition, the Corundum Exit Loan Documents will grant certain protections to the Plan Committee and the Class 5 Creditors, including, but not limited to, deferral of enforcement remedies by Corundum, should the Company default in making payments to it, so long as Corundum's loan position is secured by inventory, valued at cost, in the amount of the greater of (a) two times the then outstanding principal balance of the Corundum Claim or (b) $21 million. The Corundum Exit Loan Documents will further provide that a default by the Company in the making of payments to Suresh or to the Class 5 Creditors which results in the enforcement of any legal remedies by either shall be an event of default under the Corundum Exit Loan Documents. The Corundum Exit Loan Documents will further provide that Corundum shall provide advance written notice to the Plan Committee of any event of default, and an opportunity to cure that default, prior to the exercise of remedies by Corundum.

In addition, as discussed in Section V(A) below, through the Corundum loan facility, Mr. Shane shall make additional loans to the Company of fifty percent (50%) of federal income tax refunds he receives on account of net operating losses of the Company to assist in funding obligations under the Plan. All these additional advances will also be secured by a senior lien on the inventory of the Company. Interest will accrue on the additional loans at the rate of 11%, but principal and interest shall receive the same treatment as the TMS Claims classified in Class 6 of the Plan, except in the event of a Liquidation of the Company. In the event of a Liquidation, the principal amount of these tax refund loans, together with accrued interest thereon, will be paid

from the proceeds of inventory of the Company as a secured claim, ahead of the claims of the Class 5 General Unsecured Claims and Class 6 TMS Claims.

2. *Pre-Petition Priority Claims*

(A)   Priority Tax Claims [Unclassified in Plan]

Priority Tax Claims will be paid in full, without interest, on the Initial Distribution Date. The Debtor projects, as of the date of this Disclosure Statement, that Allowed Priority Tax Claims will total $88,186.

[(B)   Priority Non-Tax Claims  Class 1]

Priority Non-Tax Claims will be paid in full, without interest, on the Initial Distribution Date. The Debtor is not aware of any Priority Non-Tax Claims.

## B.   SECURED CLAIMS

1. *Suresh Claim* [Class 2]

The holder of the Suresh Claim will retain its blanket security interest in all assets of the Company, junior only to the senior security interest held by Corundum in inventory.  The Suresh Claim will continue to accrue interest at the rate of 11% per annum until paid.  The Suresh Claim will be paid in weekly installments of $125,000 of principal, plus interest, until the Suresh Claim is paid in full; *provided, however,* that if not sooner paid, the Suresh Claim will be paid in full on ore before December 31, 2010.  The Company shall also reimburse reasonable attorneys' fees and costs incurred by Suresh, if any, within five (5) Business Days after submission of a request for reimbursement.  In the event that Suresh issues a notice of default to the Company, the Company will, within three days of receipt of such notice of default, provide the Plan Committee with a copy of the notice.  As of June 26, 2010, the principal balance of the Suresh Claim was $3,926,000.

Prior to the Company's bankruptcy filing, Tom Shane had posted certain cash collateral to further secure the obligations owed to Suresh.  That cash collateral will be returned to Mr. Shane, under the Plan, upon full repayment of the Suresh Claim.

2. *Qwest Secured Claim* [Class 3A]

The Qwest Secured Claim will be paid in accordance with the terms of the Qwest Stipulation which was approved by the Court by order entered May 5, 2010, and will retain its security interest in the equipment sold by Qwest to the Debtor, as set forth in the Qwest Stipulation, until paid in full.  Pursuant to the Qwest Stipulation, Qwest may elect, in its Ballot, to be paid in accordance with the terms of the Qwest Stipulation, or to be paid as a Class 5 General Unsecured Claim.  If paid pursuant to the Qwest Stipulation, the Qwest Secured Claim

will be paid in monthly installments of $23,234.92, without interest, until paid in full. As of June 26, 2010, the balance of the Qwest Secured Claim was $792,251.

### 3. *Secured Tax Claims* [Class 3B]

While the Bankruptcy Code and the Plan give the Debtor the ability to repay Secured Tax Claims over a period of up to five years from the Petition Date, the Debtor intends to pay the Secured Tax Claims in full, together with accrued interest at the statutory rate provided therefor, on the Initial Distribution Date. The Debtor projects, as of the date of this Disclosure Statement, that Allowed Secured Tax Claims will total $109,458.

### C. CONVENIENCE CLASS CLAIMS [Class 4]

Convenience Class Claims are those Allowed Claims in the amount of $7,500.00 or less. The holders of Convenience Class Claims will be paid the Face Amount of their Claims, up to $7,500.00, on the later of the Initial Distribution Date or January 31, 2011. The Company projects, as of the date of this Disclosure Statement, that the total of all Allowed Unsecured Claims in amounts of $7,500.00 or less is approximately $500,000.

In addition, to the extent that the Allowed Convenience Class Claims are less than $1,500,000.00 in total, the Company may, in its discretion, reserve the difference between $1,500,000.00 and the amount necessary to pay the Allowed Convenience Class Claims in full for distribution to those creditors holding Allowed Class 5 Claims who, on their Ballot on the Plan, elect to receive $7,500.00 in full satisfaction of their Allowed Claims. If the Company receives more Ballot elections than available funds, the Company shall disburse available funds first to those creditors offering the largest discount on their claims, until the total available funds are disbursed.

### D. GENERAL UNSECURED CLAIMS [Class 5]

As of the date of this Disclosure Statement, the Company's best estimate of the total amount due to the Holders of Class 5 Allowed General Unsecured Claims (the "Class 5 Claim Amount") is $50,384,000.00. This amount will be adjusted as Disputed Claims are resolved, and as claims arising out of the rejection of Executory Contracts are asserted and resolved. On the Plan Effective Date, the Company will execute the Class 5 Note Documents, which are attached to the Plan as Exhibit 1. The Class 5 Claim Amount is the total amount of all Allowed Class 5 Claims.

Pursuant to the Class 5 Note Documents, the Class 5 Claim Amount will be repaid as follows:

*For the Company's 2011 Fiscal Year (Ending January, 2011)*

    i. On the first Business Day after the later of the Plan Effective Date or December 23, 2010, the Company will make a payment in the amount of Tax Share Amount Advances[2] received by Tom Shane and loaned to the Company, through the Corundum loan facility, as of the Effective Date. As of the date of this Disclosure Statement, Mr. Shane has collected refunds totaling $2,982,343, and thus the Tax Share Amount Advance to be made as of the Effective Date will be at least $1,491,172. The Company will also make a Distribution of Excess Cash, if any, on hand as of the same date.

    ii. An Annual Payment[3] on or before the last day of the 2011 Fiscal Year.

*For Subsequent Plan Years*

    In subsequent years, the Company will make the following Distributions:

    i.    For the months of April through June of each year, Distributions of Excess Cash[4], if any, on hand as of the last day of each such fiscal month, within twenty (20) Business Days after the end of each such fiscal month. If the actual Excess Cash is less than $100,000, the funds will not be distributed and will instead be deposited into the Plan Committee Escrow[5], and will be distributed in accordance with paragraph iv below

    ii.    For the months of July through November of each year, Excess Cash, if any, on hand as of the last day of each such fiscal month, will be deposited into the Plan Committee Escrow within twenty (20) Business Days after the end of that fiscal month, and will be distributed in accordance with paragraph v below, but are also subject to the Company's ability to secure the release of funds from the Plan Committee Escrow for working capital, as discussed in "Replenishments from Plan Committee Escrow" below;

---

[2]  Tax Share Amount Advances are loans to be made by Tom Shane, through the Corundum facility, of 50% of federal income tax refunds he receives during the term of the Plan on account of operating losses of the Company, to assist in funding the Company's performance under the Plan.

[3]  The Annual Payment is an amount calculated to be the cash on hand as of the last day of the Company's fiscal year in excess of amounts needed by the Company, as reflected in its next fiscal year Annual Budget, to assure funding of its operations during its next fiscal year.

[4] Excess Cash is defined, generally, to be unrestricted cash on hand as of the end of the month, in excess of the cash projected to be on hand as of the end of the month, as reflected in the Company's Annual Budget, subject to certain adjustments.

[5] The Plan Committee Escrow is an escrow account to be maintained by the Plan Committee to hold funds for disbursement to the Holders of Allowed Class 5 Claims.

iii.     The proceeds of any income tax refund loans made by Tom Shane, through the Corundum facility, to the Company, within ten Business Days of receipt of the funds by the Company;

iv.     An Annual Payment, if any, on or before the last day of the Company's fiscal year.

v.     To the extent that funds are deposited into the Plan Committee Escrow pursuant to paragraph i above, on or before July 15 of each year, the Plan Committee shall return those funds to the Company for Distribution to the Holders of Allowed Class 5 Claims, within ten (10) Business Days thereafter. If the total funds available for Distribution are less than $100,000, such funds will be retained in the Plan Committee Escrow and distributed pursuant to paragraph v instead.

vi.     On December 15 of each fiscal year, the Plan Committee will deliver to the Company all funds then on deposit in the Plan Committee Escrow for distribution to the Holders of Allowed Class 5 Claims, for Distribution within ten (10) Business Days thereafter. If the total funds available for Distribution are less than $100,000, the Company may distribute such funds, instead, in conjunction with the Annual Payment for that fiscal year.

*Interest*

To the extent the Holders of Allowed Class 5 Claims have not received payments totaling at least $9.1 million as of January 31, 2011 (which amount will be reduced by any Cure Costs and Convenience Class Claims paid on the Effective Date), interest on the difference between that amount, and the payments actually received, will accrue at the rate of three percent (3%) per annum. All subsequent payments will be applied first to accrued interest, and then to the principal of the Class 5 Claim Amount, until the sum of $9.1 million, plus any accrued interest, has been paid.

To the extent that the Class 5 Claim Amount has not been paid in full by August 17, 2014, interest will accrue on the outstanding balance thereof, at the Prime Rate[6] per annum, until the Class 5 Claim Amount, together with all accrued interest, has been paid in full.

*Minimum Distributions*

The Company will never be required to make any Distribution to Holders of Allowed Class 5 Claims in an amount of less than $100,000, except the final Distribution.

---

[6]   The Prime Rate is the Wall Street Journal Prime Rate, as published from time to time by the Wall Street Journal.

*Replenishments from Plan Committee Escrow*

In any month in which the Company's cash balance falls below the projected cash balance in its Annual Budget, as adjusted, for any fiscal month between July and November of any year, the Company may secure the release of funds on deposit in the Plan Committee Escrow, up to the amount of the shortfall, to fund operational needs.

*Early Payment Discount Election Procedure*

For the Company's 2011 fiscal year, the Company may reserve the difference between $1,500,000 and the total amount of the Allowed Convenience Class Claims for distribution to those creditors willing to discount all or a portion of their claims by the highest percentage. Creditors will be given the opportunity to participate in this first year election in connection with their Ballots on the Plan.

In each subsequent year, if the Company's total payments to the Holders of Allowed Class 5 Claims in that year exceed the amount projected to be paid to the Holders of Allowed Class 5 Claims, as projected in the Company's Annual Budget for that year, then the Company may reserve up to $1,500,000 of such excess for distribution to those creditors willing to discount all or a portion of their claims by the highest percentage. If the Company believes it will have excess funds available for distribution pursuant to this procedure, it will deliver election forms to all Holders of Allowed Class 5 Claims late in the year. All elections of creditors to receive a discounted prepayment of all or a portion of their claim will be held confidential by the Company.

*Distribution Record Date*

The Company will maintain a claims register reflecting all Allowed Class 5 Claims, including the current Holder of each Claim, and reflecting all Distributions made on account of each Claim. Notice of any assignment of a Claim must be delivered to the Company in writing, or the Company will not be required to recognize the assignment. Distributions will be made to the Holders of the Allowed Class 5 Claims reflected on the claims register as of the Distribution Record Date, which is 30 Business Days prior to the making of any Distribution.

*Collateral*

The Allowed Class 5 Claims will receive a limited, junior, security interest in the inventory of the Company, which secured claim will be in the amount of $10,000,000 plus an amount equivalent to the increase in the amount of the Corundum Secured Claim on account of all Tax Share Amount Advances made by Tom Shane, through Corundum, to the Company. In addition, the Company will agree not to further encumber its inventory, without the prior consent of the Plan Committee.

*Default*

As discussed later in this Disclosure Statement, the Company has made certain Projections regarding its ability to retire the obligations to the Holders of Allowed Class 5 Claims. Nevertheless, the Company is obligated only to make payments to the Holders of Allowed Class 5 Claims to the extent of its available funds, as discussed above, and the Company will not be in default under the Plan, or the Class 5 Note Documents, if it fails to meet the projected payments set forth in the Projections. The Company will only be in default if it has determined that either an Excess Cash payment or an Annual Payment should be made to the Holders of Allowed Class 5 Claims, and then fails to make such payment; if it fails to deliver reports or otherwise comply with other covenants set forth in the Class 5 Note Documents; and in either case fails to cure such default after notice of default and an opportunity to cure, or if a default exists under the Corundum restructured loan. The Plan Committee, discussed later in this Disclosure Statement, will be the agent for the Holders of Allowed Class 5 Claims, for purposes of monitoring the performance of the Company under the Plan, and enforcing any default remedies available.

*Liquidation*

In the event of a subsequent Liquidation of the Company, after payment in full of all remaining secured claims, including the Corundum Claim (including all Tax Share Amount Advances) and the Class 5 Secured Claim Amount, the remaining proceeds from Liquidation will be allocated on a *pari passu* basis to the then outstanding Class 5 Claim Amount, the TMS Claim (capped for this purpose at the amount of $22,779,021), and any other outstanding unsecured obligations of the Company as of the Liquidation.

*Subrogation*

Prior to the Company's bankruptcy filing, Mr. Shane personally posted cash collateral to secure the obligations of the Company to certain key suppliers. To the extent those creditors apply that collateral to reduce their claims against the Company, Mr. Shane will be subrogated to the claims of these suppliers, and shall be entitled to collect the final distributions to be made to those suppliers under the Plan on account of the cash collateral posted.

### E.   TMS CLAIM [Class 6]

The TMS Claim consists of unsecured loans totaling $20 million made by Tom Shane to the Company prior to the Petition Date, together with interest thereon; deferred compensation; and other amounts due and owing to Mr. Shane in a total amount of approximately $2.8 million. Interest shall accrue on the TMS Claim during the term of the Plan, but neither principal nor interest shall be paid until the Allowed Class 5 Claim Amount, together with any interest thereon, has been paid in full.

As noted above, in the event of a Liquidation of the Company, the TMS Claim, capped in the amount of $22,779,021, will share in the proceeds of the Liquidation with the then

outstanding balance of the Class 5 Claim Amount and any other outstanding unsecured obligations of the Company.

### F.     CONSIGNMENT CLAIMS [Class 7]

Allowed Class 7 Claims will be Reinstated, and will be paid in accordance with the terms of the Consignment Transactions between each Consignment Vendor and the Company.

### G.     EQUITY INTERESTS [Class 8]

Existing Equity Interest Holders will retain their Equity Interests in the Company.

## V.     IMPLEMENTATION OF PLAN

### A.     VESTING OF ASSETS; PAYMENT OF CLAIMS

Under the Plan, all assets of the bankruptcy Estate will vest in the Company, free and clear of all Liens, Claims, and Interests, other than as expressly provided for in the Plan. As of the filing of this Disclosure Statement, the Company held approximately $4 million in its operating accounts. The Company anticipates that the Initial Distribution Date will occur on or about December 23, 2010, and the Company projects that, as of the Initial Distribution Date, it will hold total cash in an amount sufficient to make the distributions required to be paid on the Initial Distribution Date under the Plan (which amounts include Administrative Expenses, Professional Fees, Priority Tax Claims, Class 1 Priority Non-Tax Claims, Class 4 Convenience Claims, the initial distribution to the Class 5 Claims in an amount equal to Tax Share Amount Advances to be made as of the Effective Date (discussed below), and any other obligations to be paid as of the Initial Distribution Date. On the Effective Date, the Class 5 Note Documents will be executed and delivered to the Plan Committee, and the Corundum Exit Loan Documents will be executed and delivered to Corundum.

The Company will use its cash on hand as of the Initial Distribution Date to pay Administrative Expenses and Cure Costs, Priority Tax Claims, Secured Tax Claims, and the Class 1 Priority Non-Tax Claims. On the later of January 31, 2011 or the Initial Distribution Date, the Company will pay the Class 4 Convenience Class Claims as provided for in the Plan.

The Company will continue to operate its business in the ordinary course, paying all operating expenses in the ordinary course of business when due, and making payments on account of the Class 2 Suresh Secured Claim, the Class 3 Qwest Secured Claim, the Class 5 Claim Amount, and the Class 7 Consignment Claims, as and when due, as provided for in the Plan, the Class 5 Note Documents, and the Corundum Exit Loan Documents, and the terms of the Consignment Transactions with the Consignment Vendors.

In addition, as described in greater detail in Section IV(D) above, to the extent the Company exceeds its financial projections, the Company may, but is not required, to implement

the Early Payment Discount Election Procedure, providing creditors with the option of receiving the discounted prepayment of their Allowed Class 5 Claims.

Further, Tom Shane has agreed to advance, through the Corundum facility, 50% of all federal income tax refunds he receives in connection with net operating losses generated by the Company (the "Tax Share Amount Advances"). As of the filing of this Disclosure Statement, Mr. Shane's tax returns have not been finalized, and thus the final amount of possible refunds has not been determined. The Company's best estimate of the total Tax Share Amount Advances to be made is approximately $3.9 million. Of that amount, Mr. Shane has already collected refunds totaling $2,982,343, and thus the minimum Tax Share Amount Advance will be $1,491,172. To the extent the Company continues to incur operating losses which may result in the generation of additional income tax refunds, Mr. Shane has agreed to continue to loan 50% of those refunds to the Company. All Tax Share Amount Advances will be treated as advances pursuant to the Corundum loan facility, and will be secured by a senior lien on the inventory of the Company. Repayment of these loans, however, will be governed by the provisions of Class 6 of the Plan, and repayment will be deferred until repayment in full of the Class 5 Allowed Claim; *provided that*, if a tax audit results in an obligation on the part of Mr. Shane to repay all or any portion of any income tax refund he has previously collected and loaned 50% of to the Company as a Tax Share Amount Advance, then the Company shall immediately pay to Corundum an amount equal to 50% of the amount Mr. Shane is obligated to repay to the Internal Revenue Service, with penalties and interest, if any, so that Mr. Shane may fulfill his payment obligations to the Internal Revenue Service.

Because the Company is a Subchapter S Corporation, its does not incur or pay income taxes on its income but instead those tax obligations are passed through to its Equity Interest Holders, Tom Shane and certain family trusts. The Company has historically made Tax Dividends and Equalization Distributions to the Equity Interest Holders to reimburse them for the income tax obligations they incur on account of the Company's income, and in order to preserve its status as a Subchapter S Corporation. The Plan allows the Company to continue this practice.

## B.    PLAN COMMITTEE

On the Effective Date, a Plan Committee will be formed from those members of the Creditors Committee willing to serve, who may continue to serve whether or not they continue to hold Allowed Claims against the Company. Any vacancies on the Plan Committee may be filled only with creditors who were, as of the Petition Date, the Holders of Allowed Class 5 Claims listed on the Company's Schedule of Twenty Largest Unsecured Creditors, and continue to hold such claims as of the date of appointment to the Plan Committee. If no such members are willing to serve, vacancies may be filled by creditors holding smaller Allowed Class 5 Claims, so long as they were creditors of the Company on the Petition Date. The Plan Committee shall dissolve on the earlier of the date on which its membership drops below three members, or when the Class 5 Claim Amount has been paid in full. If the Plan Committee dissolves prior to the payment in full of the Class 5 Claim Amount, the then-remaining members and the Company

shall agree on a designated agent to act on behalf of the Class 5 Creditors in enforcing their rights under the Class 5 Note Documents and the Plan, and shall agree on appropriate compensation for such successor, failing which the Bankruptcy Court may order the appointment of a successor agent. .

The Plan Committee shall monitor the Company's performance of its obligations under the Plan and the Class 5 Note Documents. It will receive copies of (i) the Debtor's Annual Budget; (ii) monthly financial statements; (iii) unaudited annual financial statements prepared in accordance with GAAP; (iv) federal income tax returns filed by the Company; (v) reports of Excess Cash for applicable months; (vi) a report of the Company's calculation of the Annual Payment and any funds available for Distribution pursuant to the Early Payment Discount Procedure and actual Distributions made pursuant to such procedure; (vii) and upon resolution of all Disputed Claims, a report from the Company calculating the final amount of the Class 5 Claim Amount. All reports and other information received by the Plan Committee shall be subject to confidentiality requirements.

The Plan Committee may retain professionals as it may desire, but the Company's obligation to reimburse the Plan Committee for reasonable professional fees and costs incurred shall be limited to $50,000 per year, absent any default by the Company under the Plan or the Class 5 Note Documents.

Approval of the Plan Committee shall be required for (i) settlements of Disputed Claims or Causes of Action involving settlement payments, recoveries or Allowed Claims in excess of $150,000; (ii) any proposal by the Company to implement expansion claims, as set forth in greater detail in the Class 5 Note Documents; or (iii) the granting of any new lien on inventory by the Company. The Plan Committee will have the right to raise with the Bankruptcy Court any claimed default under the Plan or the Class 5 Note Documents, and otherwise to enforce the rights and remedies set forth therein.

## C.    FINANCIAL PROJECTIONS AND VALUATION

Attached hereto as **Exhibit B** are cash-flow projections (the "Projections") for fiscal years 2011 through 2015, showing the Company's ability to fund operating expenses and to make payments required under the Plan. The Company currently anticipates that the Company will be able to retire the Class 5 Claim Amount in full in January, 2015, pursuant to the Annual Payment due for the 2015 fiscal year.

*Note Regarding Forward-Looking Statements*

THE PROJECTIONS ARE FORWARD-LOOKING STATEMENTS THAT ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH PROJECTIONS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS SUCH AS THE TYPE DESCRIBED IN ARTICLE VI. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE COMPANY IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

*Introduction*

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the Bankruptcy Court find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor. The Company's management has analyzed whether the Company will have sufficient liquidity and capital resources to fulfill its obligations under the Plan while continuing to operate its business. Accordingly, the Company's management has developed and prepared the Projections, which were prepared in good faith, based upon estimates and assumptions that were reasonable in light of current circumstances at the time the Projections were prepared. The Projections were further reviewed to analyze the Company's ability to meet its liquidity and debt service obligations under the Plan.

The Projections have been prepared based on the assumption that the Effective Date will be December 23, 2010. Although the Company is seeking to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when or if the Effective Date will actually occur. The Projections assume the Company will conduct operations substantially similar to its business currently in operation.

*Qualifications*

The Company prepared the Projections for its fiscal years 2011 through 2015, the currently anticipated duration of the Plan. The Projections are premised on numerous assumptions, including various assumptions regarding the anticipated future performance of the Company, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Company. Given the changes in the United States' economy over the past 24 months and the difficult retail environment created by the economic difficulties, it is anticipated that the Company's actual financial performance for the time periods reflected herein may differ materially (whether positively or negatively) from the Projections.

Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will inevitably vary from the projected results. These variations may be material. The estimates and assumptions in the Projections, while considered reasonable by management at the time of preparation, may not be realized and are inherently subject to uncertainties and contingencies. Although the Company believes that the assumptions underlying the Projections, when considered on an overall basis, are reasonable

in light of current circumstances, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Company to achieve the projected results of operations. In deciding whether to vote to accept or reject the Plan, claimants must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.

Furthermore, because future events and circumstances may well differ from those assumed in the Projections, no representations can be made as to the accuracy of the Projections or the Company's ability to achieve the projected results. Therefore, the Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. The inclusion of the Projections herein should not be regarded as an indication that the Company considers the Projections to be a reliable prediction of future performance. The Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments. The Company has no obligation to update or otherwise revise the Projections to reflect the occurrence of future events, and will not update the Projections (other than in the Annual Budget to be submitted to the Plan Committee), even in the event that assumptions underlying the Projections are not borne out. The Projections should be read in conjunction with the assumptions and qualifications set forth herein.

The Projections are not intended to be presented in accordance with GAAP but instead are being presented in the manner the Company believes best reflects the expected cash flow available to the Company from its operations and in a manner consistent with the Company's historic accounting. The basis of presentation for the Projections is consistent with the Company's internal forecasting methodologies.

THE COMPANY DID NOT PREPARE THE PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE SEC. THE COMPANY'S OUTSIDE ACCOUNTANTS HAVE NEITHER COMPILED NOR EXAMINED THE COMPANY'S PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

The Projections should be read in conjunction with the assumptions, qualifications and explanations set forth in this Section and this Disclosure Statement.

## D.   PROVISIONS GOVERNING DISTRIBUTIONS

*Record Date for Distributions*

Distributions will be made to the record holders of Allowed Claims as of each Record Distribution Record Date. The Distribution Record Date will be the third Business Day after the date the Confirmation Order is entered by the Court, as to Distributions to be made to all creditors other than those holding Allowed Class 5 Claims. The Distribution Record Date for each Distribution on account of Allowed Class 5 Claims will be thirty Business Days prior to

that Distribution.  The Company will have no obligation to recognize the assignment of any Allowed Claims absent receipt of written notice of such assignment, in conformance with the requirements of the Bankruptcy Code and Bankruptcy Rules.

*Delivery of Distributions*

Checks issued in payment of Allowed Claims will be null and void if not negotiated within ninety days after the date of issuance.  All Distributions to holders of Allowed Claims shall be made (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor or the Company after the date of any related Proof of Claim or after the date of the Schedules if no Proof of Claim was filed.

In the event that any distribution to any Holder of an Allowed Claim is returned as undeliverable, the Company will use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Company has determined the then current address of such Holder, at which time all missed distributions shall be made to such Holder without interest.  If the Company has been unable to locate the current address of the Holder within one year after the making of a Distribution, then that Distribution, and all subsequent Distributions that would otherwise have been made to that creditor, will be deemed unclaimed property and will revert to the Company, and that creditor shall be entitled to no further distributions under the Plan.

*Setoffs and Recoupment*

The Company may, but shall not be required to, set off against or recoup from any Claim or Claims of any nature whatsoever that the Company may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Company of any such Claim it may have against such claimant.

*No Post-petition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

*Withholding and Reporting Requirements*

The Company will comply with all tax withholding, payment, and reporting requirements imposed by applicable laws, and all Distributions under the Plan will be subject to any such withholding, payment, and reporting requirements.

30

*Objections to Claims; Estimation Proceedings*

Except as set forth in the Plan or any applicable Court order, all objections to Claims must be filed and served on the Holders of such Claims by a date no later than ten days prior to the date that votes are due on the Plan. If no timely objection is filed to a Proof of Claim, then the Claim will be deemed Allowed.

The Company may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable.

*Authority to Prosecute Objections*

After the Effective Date, only the Company shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims, including, without limitation, Cure Costs. The Company may settle or compromise any Disputed Claim without approval of the Bankruptcy Court, but Plan Committee approval will be required of any settlements resulting in an Allowed Claim of more than $150,000.

*Treatment of Disputed Claims*

No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Disputed Claim becomes an Allowed Claim. So long as a Claim is Disputed, the Debtor will reserve, in a separate Disputed Claims Reserve account, the Distribution that would have been made on the Claim if it were an Allowed Claim. Once the Allowed amount of the Disputed Claim is determined, by settlement or Court order, then the Company will, on the next Distribution Date, distribute to the Holder of the Allowed Claim the Distributions it would have received under the Plan through that date, on account of the Allowed amount of the Claim.

## E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, the Company shall assume all executory contracts and unexpired leases identified in Schedule 7.1 to the Plan, and will pay the Cure Costs related thereto, as set out in Schedule 7.1, on the Initial Distribution Date. As discussed in Section II.D. above, the Company has, prior to the Effective Date, assumed several leases and executory contracts and has paid the related Cure Costs.

If there is a dispute regarding (i) the nature or amount of any Cure Cost, (ii) the ability of the Company to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute; provided, however, that the Company will be authorized

to reject any executory contract or unexpired lease to the extent it, in the exercise of its sound business judgment, concludes that the amount of the Cure Cost as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to it.

On the Effective Date, the Company will reject any executory contracts or unexpired leases identified in Schedule 7.4 to the Plan, and the other parties to those contracts and leases will have thirty (30) days after the Effective Date within which to file a proof of claim with the Court for damages arising out of such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Company, its Estate, and its property.

On the Effective Date, the Company will assume the ordinary course gift card obligations, customer warranties, customer exchange programs, customer upgrade programs, layaway deposit obligations, and all such similar customer satisfaction programs and obligations maintained by the Company for the benefit of its customers; *provided that* such claims (i) arise from merchandise or gift cards sold in the ordinary course and (ii) shall not include any escheatment claims asserted by any governmental entity or any similar claim. The assumed liability of the Company shall be subject to such limitations as the Company may impose after the Effective Date on such customer satisfaction programs in the ordinary course of business.

Except to the extent otherwise provided for in the Plan, all ordinary course employee compensation and benefit programs of the Company in effect during the pendency of the Chapter 11 Case, including all health and welfare plans, 401(k) plans, vacation benefits, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Case, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code and Article 7 of the Plan. Nothing contained in the Plan shall be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Company's right to modify or terminate any such programs.

Indemnification Obligations owed to directors, officers, and employees of the Company, as provided for in the Company's Articles of Incorporation, Bylaws, or by applicable state law, will not be discharged by the Plan. Similarly, Indemnification Obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, self-interested transactions or intentional tort, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code and Article 7 of the Plan.

## F.    MANAGEMENT

On the Effective Date, executive management of the Company will continue to consist of the following individuals:

Tom Shane, President and Chief Executive Officer
Rordan Shane, Executive Vice President
Bill Richins, Executive Vice President and Chief Administrative Officer
Scott Danitz, Chief Financial Officer, Secretary and Treasurer

On the Effective Date, the Directors of the Company will continue to consist of Tom Shane, Jon Shane, Rordan Shane, and Kelsey Shane.

Tom Shane has agreed to cap the annual salary he receives under the Plan at $1,425,000, until the Class 5 Claim Amount has been repaid. All other members of management shall continue to be compensated pursuant to the terms of any agreements between them and the Company, or otherwise in accordance with the Company's Projections, its Annual Budgets, and in the Company's exercise of reasonable business judgment. The Directors will continue to serve without compensation.

While, during the term of the Plan, the compensation of Tom Shane shall be limited to $1,425,000 per year, additional amounts may be accrued and paid upon payment in full of the Class 5 Claim Amount. This limitation on compensation shall not affect the repayment of the Corundum Secured Claim, payments on account of the TMS Class 6 Claim, or Mr. Shane's subrogation rights.

## G. RETENTION OF PROFESSIONALS

The Company may retain such professionals as it reasonably requires to fulfill its obligations under the Plan on ordinary business terms. Compensation may be paid to such professionals, without Bankruptcy Court approval.

## H. DISCHARGE

On the Effective Date, the Company will be discharged from all Claims or other debts, liabilities, or obligations of every kind and nature that arose in whole or in part before the Effective Date, except as otherwise expressly provided for in the Plan.

## I. RELEASES AND RELATED MATTERS

On the Effective Date, to the extent permitted by applicable law, all claims of the Company and the Estate against (i) any of the present or former shareholders, directors, officers, employees or advisors of the Company who served in such capacities as of or after the Petition Date; (ii) any Professionals of the Company; and (iii) the Creditors Committee, its members, and its and their advisors, respectively (but not its members in their individual capacities) (jointly, the "Released Parties"), other than claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, self-interested transactions or intentional tort, shall be released and waived; *provided that* the Company may assert and enforce any claims, causes of action or liabilities it may have against any employee (including directors and officers) for alleged breach

of confidentiality, or any other contractual obligations owed to the Company, including non-compete, confidentiality, and related agreements or obligations.

As of the Effective Date, each Holder of a Claim that receives a Distribution pursuant to the Plan and who voted to accept the Plan will also be deemed to forever release and waive any and all claims against the Released Parties in connection with or related to the Company, the conduct of the Company's business, the Chapter 11 Case, or the Plan (other than the rights under the Plan or reserved in the Plan and the contracts delivered thereunder); *provided that* that nothing in the Plan shall be deemed to prohibit any party from asserting or enforcing any direct contractual obligation against any such party, including any personal guaranty of an obligation of the Company to such party.

None of the Released Parties shall have or incur any liability to any Holder of a Claim or an Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct.

## J.     PERMANENT INJUNCTION

The Confirmation Order shall permanently enjoin all proceedings for the collection of any debt of the Company arising prior to the Petition Date, unless specifically modified by any order of the Bankruptcy Court, entered after notice and hearing, and unless, and to the extent, that injunction is terminated pursuant to the provisions of the Plan.   The permanent injunction does not apply to actions to collect pre-petition or post-petition debts owed by third parties, including guarantors of the Company's obligations (except to the extent any claims against such third parties are released pursuant to the prior paragraph).   In addition, should the Company default under its payment obligations to Corundum, Suresh, or the Class 5 Creditors under the Plan, the Corundum Exit Loan Documents, or the Class 5 Note Documents, the permanent injunction will be dissolved as to such creditor or Class of creditors to allow it to bring action against the Company under the applicable loan documents, the terms of the Plan, and applicable state law.

## K.     FINAL DECREE

At any time after substantial consummation of the Plan, the Company may file a motion for entry of a final decree to close its bankruptcy case to further administration.  Such a motion shall be filed no later than 30 days after all proceedings regarding Disputed Claims, and any other administrative proceedings, other than adversary proceedings, have been resolved.

## L.    CONDITIONS PRECEDENT TO EFFECTIVE DATE

The occurrence of the Effective Date of the Plan is subject to satisfaction of several conditions precedent, the most significant of which are:

i.      Entry of the Confirmation Order containing terms and conditions reasonably acceptable to the Company and the Creditors Committee;

ii.     Tom Shane shall be employed by the Company and acting in the capacity of President and Chief Executive Officer;

iii.    The Suresh Supply Agreement shall have been terminated on terms and conditions acceptable to the Company in its sole and absolute discretion;

iv.     The Company will have in immediately available Cash sums sufficient to pay all amounts required to be paid on the Initial Distribution Date (including Administrative Expenses and Cure Costs, Professional Fees, Priority Tax Claims, Class 1 Priority Non-Tax Claims, Class 4 Convenience Claims, the initial Tax Share Amount Advances to be paid to the Holders of Allowed Class 5 Claims, and any other obligations to be paid as of the Initial Distribution Date) and to provide sufficient working capital for the Company's future business operations, as set forth in its 2012 Annual Budget;

v.      The Company will not have incurred a material adverse change in the value of its assets or operations, in comparison to the financial statements and Projections set forth herein, from the filing of the Plan to the Confirmation Date, as determined by the Company and Corundum in the exercise of their reasonable business judgment.

Each of the conditions precedent may be waived, in whole or in part, by the Company and, as applicable, Corundum and the Creditors Committee, without notice or order of the Bankruptcy Court.

## M.    SUBSTANTIAL CONSUMMATION

Substantial consummation of the Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Initial Distribution Date.

## N.    WAIVER OF PREFERENCE ACTIONS; PRESERVATION OF OTHER CLAIMS

Effective as of the Effective Date, the Debtor shall have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under section 547 of the Bankruptcy Code and any similar state law. All other Causes of Action and Avoidance Actions are preserved and may be prosecuted by the Company

## O.     RETENTION OF JURISDICTION

The Bankruptcy Court shall retain exclusive jurisdiction, after entry of the Confirmation Order, over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, as set forth in greater detail in the Plan.

## P.     MISCELLANEOUS

### Payment of Statutory Fees

All fees payable under the Bankruptcy Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

### Amendment, Modification or Withdrawal of the Plan

Prior to entry of the Confirmation Order, the Company may amend the Plan at any time, with the consent of the Creditors Committee. Notice of any amendments or modifications will be given to interested parties to the extent required by the Bankruptcy Rules or order of the Bankruptcy Court. After entry of the Confirmation Order, but prior to substantial consummation, the Company may amend the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan, so long as those amendments or modifications do not adversely affect the treatment of Holders of Claims under the Plan, subject to such notice to parties in interest as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. The Company may withdraw the Plan at any time prior to entry of the Confirmation Order.

## VI.     RISK FACTORS

The holders of Claims against the Company should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.     RISK FACTORS REGARDING THE COMPANY'S BUSINESS

### Inherent Uncertainty of Projections

The Projections cover the operations of the Company through the Company's 2015 fiscal year. The fundamental premise of the Plan is the implementation and realization of the Company's business plan. The Projections are premised on numerous assumptions concerning the anticipated post-financial restructuring performance of the Company, some of which may not materialize. Such assumptions include, among other items, assumptions concerning (i) the general economy; (ii) industry performance; (iii) the ability to make necessary capital expenditures; (iv) the ability to establish market strength; (v) consumer trends and preferences; (vi) the ability to stabilize and grow the Company's sales volume and control future operating

expenses; (vii) no material adverse changes in competition; (viii) retention of key management and other key employees; (ix) the absence of material contingent or unliquidated litigation, indemnity or other claims; and (x) other matters, many of which will be beyond the control of the Company and some or all of which may not materialize.  The Company believes that the assumptions underlying the Projections are reasonable.  However, unanticipated events and circumstances occurring after preparation of the Projections may affect the Company's ability to maximize the intended benefits of the Plan and undermine the financial results of the Company. Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results, and such variations may be material and adverse. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Projections were not prepared with a view to compliance with published guidelines of the Securities and Exchange Commission regarding projections or forecasts.  The Projections have not been audited, reviewed, or compiled by the Company's independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Company, the Company's advisors or any other Person that the Projections can or will be achieved.

*Business Risks*

The Company faces a number of risks with respect to its continuing business operations, including but not limited to the following:  (i) the confirmation and consummation of the Plan; (ii) future financial results and liquidity, including the ability to finance operations in the normal course; (iii) its ability to fund and finance capital expenditures in the future; (iv) the ability to retain key personnel; (v) changes in the economy and the credit markets; (vi) the effects of the current economic downturn on inventory and operating costs and sales volume and pricing; (vii) fluctuations in the cost and availability of appropriate inventory; (viii) the relationships with and payment terms provided by trade creditors; (ix) increases in labor and employee benefit costs, such as health care expenses; (x) the effect of competitive products or pricing by competitors; (xi) its response to the entry of new competitors into its markets; (xii) the ability to improve profitability and generate positive operating cash flow; (xiii) future dispositions and acquisitions; (xiv) changes in federal, state or local laws or regulations affecting retailing, (xv) changes in accounting standards, taxation requirements and bankruptcy laws; and (xvi) each of the other risks identified in this Disclosure Statement.

*Impact of the U.S. Economy*

The Company's business is vulnerable to the U.S. economy and the varying economic and business cycles of its customers.

*Incurrence of Significant Losses in Recent Years*

Although the restructuring provided under the Plan is expected to improve the Company's balance sheet, there can be no assurance that the Company will be, or of the extent to which it will be, profitable.

*The Company's Business Operations Could Be Significantly Disrupted if It Lost Members of Its Management Team*

The Company's success depends to a significant degree upon the continued contributions of its executive officers and key employees, both individually and as a group. The Company's future performance will be substantially dependent on its ability to retain and motivate them. The loss of the services of any of these executive officers or key employees could prevent the Company from executing its business strategy.

*Leverage*

The Company believes that it will emerge from chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with its business plan. Circumstances, however, may arise that might cause the Company to conclude that it is overleveraged, which could have significant negative consequences, including: (i) it may become more difficult for the Company to satisfy all of its obligations; (ii) the Company may be vulnerable to a prolonged downturn in the market in which it operates or a prolonged downturn in the economy in general; (iii) the Company may be required to dedicate a substantial portion of its cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements; (iv) the Company may be limited in its flexibility to plan for, or react to, changes in its business and the industry in which it operates or entry of new competitors into its markets; (v) the Company may be placed at a competitive disadvantage compared with its competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and (vi) the Company may be limited in borrowing additional funds.

Additionally, there may be factors beyond the control of the Company that could affect its ability to meet debt service requirements. The Company's ability to meet debt service requirements will depend on its future performance, which, in turn will depend on its ability to sustain sales conditions in the markets in which the Company operates, the economy generally, and other factors that are beyond its control. The Company can provide no assurance that the Company's business will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Company to pay its indebtedness or to fund its other liquidity needs.

*The Class 5 Note Documents for the benefit of the Class 5 General Unsecured Creditors Contain Covenants That Impose Restrictions on the Company's Financial and Business Operations*

The Class 5 Note Documents for the benefit of the Class 5 Creditors grant the Class 5 Creditors a limited security interest in the Company's inventory, and limit the Company's ability to expand without the consent of the Plan Committee. These provisions may have important consequences for the Company's operations. In addition, if the Company fails to make any payments it is required to make to the Holders of Allowed Class 5 Claims, or violates any other covenant of the Class 5 Note Documents, and is unable to obtain a waiver or amendment, an event of default would result under the Class 5 Note Documents.

*Adverse Publicity*

Adverse publicity or news coverage relating to the Company, including but not limited to publicity or news coverage in connection with the Chapter 11 Case, may negatively affect the Company's efforts to establish and promote name recognition and a positive image after the Effective Date.

## B.   RISK FACTORS RELATING TO THE CHAPTER 11 CASE

*Parties in Interest May Object to the Company's Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Company believes that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code. Certain holders of Claims may nevertheless object to the classification of their Claims.

In such event, the cost of the Plan and the time needed to confirm the Plan could increase and the Bankruptcy Court may not agree with the Company's classification of Claims. If the Bankruptcy Court concludes that the classification of Claims under the Plan does not comply with the requirements of the Bankruptcy Code, the Company may need to modify the Plan. Such modification could require a resolicitation of votes on the Plan. If the Bankruptcy Court determines that the Company's classification of Claims was not appropriate or if the Bankruptcy Court determines that different treatment provided to similarly situated Claim holders was unfair or inappropriate, the Plan may not be confirmed. If this occurs, the amended plan of reorganization that would ultimately be confirmed may be less attractive to certain Classes than the Plan.

*The Company May Object to the Amount, Secured Status or Priority Status of a Claim*

The Company reserves the right to object to the amount, the secured status or the priority status of any Claim under the Plan, except where indicated otherwise in the Plan, although the Company has agreed that any such objections must be made prior to ten days before Ballots are due on the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by a holder of any Claim whose Claim is or may be subject to an objection. Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

*In Certain Instances, Any Chapter 11 Case May Be Converted to a Case Under Chapter 7 of the Bankruptcy Code*

If no plan can be confirmed, or if the Bankruptcy Court finds that it would be in the best interest of creditors and/or the Company, the Bankruptcy Court may convert the Company's chapter 11 case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Company's Assets for distribution in

accordance with the priorities established by the Bankruptcy Code. The Company believes that liquidation under chapter 7 would result in no distributions being made to holders of Equity Interests, and significantly smaller distributions being made to the Company's general unsecured creditors than those provided for in the Plan because of (i) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Company's business as a going concern; (ii) the nature of the Assets themselves, which limits their desirability in a liquidation, as they are heavily bridal goods with a limited market, no matter their price, combined with the likelihood that many grooms may be reluctant to purchase an engagement or wedding ring through a public liquidation process; (iii) additional administrative expenses involved in the appointment of a chapter 7 trustee; (iv) the Corundum facility would be repaid prior to any payment to the general unsecured creditors; (v) Tom Shane would not consent to the subordination and deferral in payment of the TMS Claims; (vi) the landlords of those real property leases assumed during the Bankruptcy Case may be entitled to an allowed administrative priority claims equal to two years' of future rents, diluting the funds available for the remaining creditors; and (vii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations.

### The Bankruptcy Court May Decline to Confirm the Plan

Although the Company believes that the Plan satisfies all requirements necessary for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In the event that the Bankruptcy Court refuses to confirm the Plan, the Company may be required to seek an alternative restructuring of its obligations. There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to the Company's creditors and shareholders as the terms proposed in the Plan.

The confirmation of the Plan is subject to certain conditions and requirements of the Bankruptcy Code. The Bankruptcy Court may determine that one or more of those requirements is not satisfied. For example, the Bankruptcy Court might determine that the Plan is not "feasible" under section 1129(a)(11) of the Bankruptcy Code. For the Plan to be feasible, the Company must establish that the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Company. While the feasibility requirement is not rigorous, it does require the Company to put forth concrete evidence indicating that it has a reasonable likelihood of meeting its obligations under the Plan and remaining a commercially viable entity.

### The Company May Fail to Meet All Conditions Precedent to Effectiveness of the Plan

Although the Company believes that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date, including (i) the entry of a Confirmation Order; (ii) execution

and delivery of certain documents; and (iii) having sufficient funds on hand to make those distributions required to be made under the Plan on the Effective Date and Initial Distribution Date and to fund on-going operations, have not occurred, the Plan may not be confirmed by the Bankruptcy Court.

*The Company May Seek to Amend, Waive, Modify or Withdraw the Plan at Any Time Prior to the Confirmation Date*

The Company reserves the right, prior to confirmation or substantial consummation of the Plan, subject to the provisions of section 1127 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, and subject to the approval of the Creditors Committee, to amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes. All holders of Claims and Equity Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances but prior to confirmation of the Plan, the Company seeks to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice has been given to designated parties, that such modification was *de minimis*, purely technical or otherwise did not materially, adversely change the treatment of holders of accepting Claims.

## VII.   COMPARISON WITH CHAPTER 7 LIQUIDATION

### A.   INTRODUCTION

Under the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code, a court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who is impaired by the plan and who does not vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the bankruptcy court must: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if the debtor's chapter 11 case were converted to a chapter 7 case as of June 26, 2010, the conclusion of the Company's last fiscal month for which all reporting has been completed prior to filing this Disclosure Statement, and the assets of the estate (the "Assets") were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each non-accepting holder of a claim or equity interest would receive from the Liquidation Proceeds under the priority scheme dictated in the Bankruptcy Code; and (3) compare each holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such holder would receive if the plan were confirmed and consummated.

41

To demonstrate that the Plan satisfies the "best interests" test, the Company has prepared the hypothetical liquidation analysis attached hereto as **Exhibit C** (the "Liquidation Analysis"), which is based upon certain assumptions herein.

Under the Plan, only Claims in Classes 2, 4, 5, and 6 are impaired. As to these Classes, the "best interests" test will apply only to those holders of Claims, if any, who vote to reject the Plan.

## B.   SCOPE, INTENT, AND PURPOSE OF THE LIQUIDATION ANALYSIS

The determination of the costs of, and proceeds from, the liquidation of the Company's Assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Company, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Company and its management. Inevitably, some assumptions in the Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. In addition, the Company's management cannot judge with any degree of certainty the effect of the forced liquidation asset sales on the recoverable value of the Company's Assets.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ACTUAL RECOVERIES FROM THE LIQUIDATION OF ASSETS REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE COMPANY WERE LIQUIDATED UNDER CHAPTER 7 AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Company were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended to be, and should not be, used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Company estimated Allowed Claims based upon a review of the Claims contained in the Company's books and records. In addition, the Liquidation Analysis includes estimates for Claims that would not be asserted in the Company's chapter 11 case, but which could be asserted and allowed in a chapter 7 liquidation, including certain Administrative Expense Claims, wind-down costs, trustee fees, tax liabilities and certain lease and contract rejection damages Claims. The Company's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the

Prepackaged Plan.   NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE COMPANY.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## C.    GLOBAL ASSUMPTIONS IN THE LIQUIDATION ANALYSIS

The Liquidation Analysis presents both "High, "Medium" and "Low" estimates of Liquidation Proceeds, representing a range of management's assumptions and estimates relating to the proceeds to be received from the liquidation of assets less the costs incurred during the liquidation.  The Liquidation Analysis assumes conversion of the Chapter 11 Case to one under chapter 7 on approximately June 26, 2010 (the end of the last fiscal month for which reporting has been completed prior to the filing of this Disclosure Statement) ("Conversion Date") and the liquidation of the Company would be conducted by and under the direction of a trustee appointed by the US Trustee pursuant to the Bankruptcy Code (the "Chapter 7 Trustee") plus certain current employees of the Company who would be retained to supervise going out of business sales, and to wind down the operation and disposition of the Company's other assets on a piecemeal basis, and/or at auction.  It is assumed that a majority of the liquidation would be conducted through going out of business sales conducted by the Chapter 7 trustee over a 13-week period, and an additional 13-week period would be used to complete the final disposition of assets, and the complete wind-up of the Debtor's operations.  During the liquidation, the Chapter 7 Trustee would generally undertake: (i) the sale of the inventory and personal property; (ii) the orderly collection of existing accounts receivable during the wind-down; (iii) the orderly sale of equipment and other fixed assets; and (iv) the orderly wind-down of daily operations.

The Liquidation Analysis also assumes that the gross amount of assets and the cash available for distribution would be the sum of the Liquidation Proceeds.  Recovery on any preference claims is not expected to have any material effect on total proceeds available.  There are no pending lawsuits against third parties that are expected to result in net proceeds to the Company.  The Liquidation Analysis assumes that the Chapter 7 Trustee would reject all real property leases, resulting in significant rejection damage claims by the landlords.  Under the Bankruptcy Code, landlords whose leases have been assumed during the Chapter 11 reorganization are entitled to assert rejection damage claims with administrative priority status for up to two years of future rents.  As of the filing of this Disclosure Statement, a total of six real property leases have been assumed by the Company (including five store locations and the corporate headquarters), thus creating substantial Administrative Expense Claims in favor of those landlords.

The Liquidation Analysis assumes that the net Liquidation Proceeds would be distributed in accordance with the priorities required by sections 726 and 507 of the Bankruptcy Code.  Specifically, net value from the liquidation of the Assets after the payment of fees associated with the liquidation generally would be distributed first to satisfy secured claims to the extent of the collateral value securing such claims, in order of priority.  Next, value would flow to

unsecured claims, beginning with Administrative Expense Claims (including any incremental Administrative Expense Claims that may result from the termination of the Company's business and the liquidation of its assets), second to unsecured Claims accorded priority under the Bankruptcy Code, and third to General Unsecured Claims. No distribution would be made to holders of Equity Interests.

## D.    PRIMARY ASSETS OF THE COMPANY

The Liquidation Analysis assumes a liquidation of all of the Assets, which include jewelry and other inventory, equipment, furniture and fixtures, and a nominal amount of accounts receivable and other claims. The Liquidation Analysis assumes a range of recoveries for these Assets assuming the Chapter 7 Trustee's retention of a liquidation firm to conduct liquidation sales in the Company's retail locations. The Company's management believes that values generated in the Liquidation Analysis do not generate a significant recovery for stakeholders as compared with the going concern valuation of the Assets. In particular, holders of General Unsecured Claims are projected to receive distributions ranging from 7% to 24.6% of their Claims, a dramatic reduction from the full payment called for in the Plan, even after discounting the future payment stream to present value.

## E.    FORCED LIQUIDATION SALE PROCESS

The estimated liquidation proceeds generated for the Company was derived assuming a forced liquidation and wind-down of the Company's operations. The Company's management derived a range of potential recovery values for each class of Assets based on a number of factors, including the following: the general state of the economy; local and regional market conditions, and the prospect of liquidators offering to assume the complete cost of conducting going out of business sales in exchange for a fixed price to be paid for all inventory on hand. The Liquidation Analysis assumes that a liquidation of the Assets occurs over 6 months, 3 month to conclude going out of business sales designed to maximize the value of the inventory, and an additional 3 months to sell all of the remaining physical Assets of the Company. This reflects an estimate of the time required to conduct going out of business sales at the Company's retail locations, and to dispose of or sell the material fixed Assets and wind down the physical operations related to the Company's business. This period of time would provide the Chapter 7 Trustee the necessary time to resolve claims as well as distribute proceeds from the sale of the physical Assets. The analysis also assumes all executory contracts and unexpired real property leases would be rejected during the pendency of the liquidation, and an estimate of the potential claims generated by that rejection have been included in the analysis. The Company's management has projected rejection damage claims for the real property leases. Management cannot reasonably predict claims that may arise out of the rejection of the numerous executory contracts the Company has with third parties, such as intellectual property licenses, maintenance contracts, and equipment leases. If the cash flows from the sale of the Company's Assets are not sufficient to fund the ongoing operations during the wind-down period, the Chapter 7 Trustee may have to lower expectations related to potential recovery value for the material Assets and further reduce the recovery estimates contained in this Liquidation Analysis.

44

### F.   FACTORS CONSIDERED IN VALUING HYPOTHETICAL LIQUIDATION PROCEEDS

The estimated Net Book Values of the Assets were primarily derived from the Company's books and records as of June 26, 2010. In addition, the net estimated Liquidation Proceeds are on a current value basis rather than a net present value basis even though the liquidation is expected to take place over a period of 6 months.

It is also possible that distribution of the Liquidation Proceeds would be delayed while the Chapter 7 Trustee and its professionals become knowledgeable about the Chapter 11 Case and the Company's business and operations. This delay could materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (a) liquidation of the Company under chapter 7 of the Bankruptcy Code (b) an alternative plan of reorganization, and (c) dismissal of the bankruptcy case.

### A.   LIQUIDATION UNDER CHAPTER 7

If the Plan cannot be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code. In such a case, a trustee would be appointed to liquidate the assets of the Company for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code. The trustee would retain professionals at the expense of the Company's Estate, liquidate the Company's remaining assets and, if necessary, investigate and pursue causes of action on the Company's behalf. A discussion of the effects of a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests and the Company's liquidation analysis is set forth in Section VII.

The Company believes that liquidation under chapter 7 would result in (a) significantly smaller distributions being made to its creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Company would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time in extremely poor market conditions; (ii) the limited market for the Company's assets, which are heavily bridal; (iii) additional administrative expenses involved in the appointment of a trustee and its professionals; and (iv) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Company's operations; and (b) significantly less recovery for holders of General Unsecured Claims.

### B.   ALTERNATIVE PLAN(S) OF REORGANIZATION

If the Plan is not confirmed, the Company (or, in certain circumstances, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a

45

reorganization and continuation of the Company's businesses, a sale of the Company's operations as a going concern, or an orderly liquidation of assets, or some combination thereof. With respect to an alternative plan, the Company has explored various alternatives in connection with the formulation and development of the Plan. The Company believes that its Plan enables its creditors to realize the most value under the present circumstances.

## C.   DISMISSAL OF THE BANKRUPTCY CASE

An alternative to conversion of the case to a Chapter 7 liquidation could be the dismissal of the bankruptcy case. A dismissal of the bankruptcy case results in a termination of the automatic stay. Those creditors holding liens on the Company's assets could commence foreclosure proceedings on those assets. Unsecured creditors would be free to bring suit against the Company seeking to recover on their claims. Given that the Company's primary secured debt is held by insiders, it is conceivable that the Company would be able to continue to operate, despite being faced with lawsuits from its suppliers, while it defended or attempted to settle those lawsuits. The general creditors would not receive equal treatment, under such circumstances, and those creditors who most aggressively pursued recovery of their claims would likely receive payment in full. The costs of defense against such lawsuits, and the distraction of management from operation of the Company, could have a significant, deleterious, effect on its operations that could result in its complete cessation of operations.

## IX.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to the Company and holders of Allowed Claims. This discussion does not address U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in cash under the Plan, or who are based in foreign countries.

This summary is based on the Tax Code, Treasury regulations promulgated thereunder, published rulings of the U.S. Internal Revenue Service (the "IRS") and judicial and administrative interpretations thereof, in each case as in effect and available as of the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Company has not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any such other authorities. Thus no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, banks and certain other financial institutions, holders that are, or hold Claims through, partnerships or

46

other pass-through entities for U.S. federal income tax purposes). In addition, this discussion does not address U.S. federal taxes other than income taxes.

THIS SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR.

## A.    CONSEQUENCES TO THE COMPANY

The Company is a Subchapter S corporation. As a result, the Company does not pay federal income taxes on taxable income of the Company, nor does it realize the tax benefits of any operating losses. Rather, the Equity Interest Holders of the Company are responsible for the tax liabilities of the Company, and receive the tax benefits of any operating losses.

As is common of most Subchapter S corporations, the Company historically made tax dividends to its shareholders to reimburse them for the tax obligations they incurred, personally, on account of the Company's operations, and equalizing distributions so that all shareholders received the same percentage dividends, as required by the Tax Code to maintain Subchapter S status. As discussed above, the Company has suffered net operating losses which have generated income tax refunds for the Equity Interest Holders, a portion of which will be loaned to the Company to help fund its performance under the Plan. The Company will make tax dividends and pay equalizing distributions to the Equity Interest holders to reimburse them for actual income tax obligations they incur, together with any interest and penalties thereon, and shall reimburse the Equity Interest Holders for their compliance and representational costs before the taxing authorities, which tax obligations and related costs are incurred by the Equity Interest Holders in order to preserve the Company's Subchapter S status.

## B.    CANCELLATION OF DEBT INCOME

Because the Plan proposes to pay all Allowed Claims in full, over time, the Company does not expect to realize any cancellation of debt ("COD") income as a result of the implementation of the Plan. COD income is generally realized when claims are not paid in full, and is determined by the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. If any COD income is realized, to avoid incurring tax obligations on account of COD income, the Company may elect to reduce the basis of its depreciable property, or to reduce NOL carryforwards or other tax attributes.

## C.    CONSEQUENCES TO HOLDERS OF CLAIMS

This discussion is limited to domestic taxpayers.

47

*Repayment of Principal*

The repayment of Allowed Claims generally has no tax consequences to the Holders of such Claims, because the repayment of debt is not a taxable event to the holder of that debt. To the extent that accrued interest is included in the Allowed Claim, the repayment of such interest may generate taxable income to the Holder.

*Information Reporting and Backup Withholding*

Payments of interest and any other reportable payments, possibly including consideration received pursuant to the Plan, may be subject to "backup withholding" (currently at a rate of 28%) if the recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld pursuant to these rules will generally be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate information is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally will not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning the above payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Prepackaged Plan would be subject to these regulations and require disclosure on your tax return.

## X.   CONFIRMATION OF THE PLAN

### A.   CONFIRMATION

Confirmation of the Plan means that the Court has approved the Plan. Upon Confirmation, the Plan becomes a contract binding upon the creditors and interest holders of the Company and on the Company itself.

### B.   CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing. The Court has scheduled a hearing on confirmation of the Plan for _____, at ____ .m.   The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of

48

the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtor's estate or property and the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (1) counsel for Company; (2) Counsel for Committee; and (3) such other parties as the Bankruptcy Court may order, so as to be received no later than _____ .m on _____, 2010.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### C.   REQUIREMENTS FOR CONFIRMATION OF THE PLAN – CONSENSUAL CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied:

> ➢ The Plan complies with the applicable provisions of the Bankruptcy Code.

> ➢ The Company has complied with the applicable provisions of the Bankruptcy Code.

> ➢ The Plan has been proposed in good faith and not by any means forbidden by law.

> ➢ Any payment made or promised by the Company under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

> ➢ The Company has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Company; and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Company has disclosed the identity of any insider that will be employed or retained by the Company, and the nature of any compensation for such insider.

49

➢ With respect to each class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

➢ Except to the extent the Plan meets the "Non-Consensual Confirmation" standards discussed below, each class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

➢ Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five (5) years after the date of the order for relief, of a value, as of the Effective Date, equal to the allowed amount of such Claims with interest from the Effective Date.

➢ At least one (1) class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

➢ Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Company or any successor to the Company under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

➢ All fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

## D.     BEST INTERESTS TEST

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (i) accepts the plan of reorganization or (ii) receives or retains under the Plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the applicable debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This is referred to as the "Best Interests Test."

To show that the Plan complies with this test, the Company estimated a range of proceeds that would be generated from a chapter 7 liquidation of the Debtor in the Liquidation Analysis. Please see the Section VII.C. entitled "Liquidation Analysis." Notwithstanding the difficulties in

quantifying recoveries to creditors with precision, the Company believes that taking into account the Liquidation Analysis, the Plan meets the "best interests" test of Bankruptcy Code section 1129(a)(7).

The Company believes that the holders of Equity Interests in the Company would receive no recovery in a chapter 7 liquidation. The Company also believes that the holders of Claims in Class 5 would receive distributions in the range of 7% to 24.6% of their Allowed Claims. The Plan proposes to pay the principal amount of the Allowed Class 5 Claims in full, over time, with interest under certain circumstances. All of these factors lead to the conclusion that recoveries under the Plan would be significantly greater for the general unsecured creditors than the recoveries available in a chapter 7 liquidation.

## E.    FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires that the court find that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Company has analyzed its ability to meet its obligations under the Plan. As part of this analysis, the Company has prepared the Projections. The Projections indicate that the Company should have sufficient cash flow to pay and service its debt obligations and to fund its operations. Accordingly, the Company believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code. To support its belief in the feasibility of the Plan, the Company has relied upon the Projections, which are attached as Exhibit B.

## F.    CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES: THE "CRAM DOWN" ALTERNATIVE

Notwithstanding rejection of the plan by an impaired class, the Bankruptcy Code permits confirmation of a plan of reorganization, so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class, and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan. These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

*Fair and Equitable*

The Bankruptcy Code establishes different tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and interest holders as follows:

*Secured Creditors*

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such holder's interest in the Estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

The Plan satisfies each of these requirements as to the classes of Secured Claims because the Plan proposes to pay the Allowed Claims of each secured creditor in full, in accordance with the terms of the pre-petition credit agreements between those creditors and the Company, and provides that the secured creditors will retain their liens and security interests until their claims have been paid in full.

*Unsecured Creditors*

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests. Because the Allowed Class 4 and 5 Claims will not receive interest on account of their Allowed Claims, except in certain circumstances, the Plan does not satisfy the fair and equitable test as to Classes 4 and 5, and Classes 4 and 5 must vote in favor of the Plan for the Plan to be confirmed.

*Unfair Discrimination*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or interests. The Company does not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests. The Company believes that, except as noted, the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## G.    EFFECT OF CONFIRMATION

The provisions of a confirmed Plan of Reorganization bind the Company, creditors, and equity interest holders, whether the party's Claim or interest is impaired and whether the party voted for the Plan.  The Plan constitutes a new contract between the Company and each of the parties in interest provided for in the Plan.  Each old debt or Claim is replaced by a new one, as defined in the Plan.

## H.    FURTHER INFORMATION; ADDITIONAL COPIES

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or order of the Bankruptcy Court), please contact the Voting Agent at:

> Shane Co. Balloting
> c/o Kurtzman Carson Consultants, LLC
> 2335 Alaska Avenue
> El Segundo, CA  90245
>
> (866) 381-9100

## XI.    VOTING

Your vote on the Plan is important.  The Plan can be confirmed if, among other things, it is accepted by the holders of two-thirds in amount and more than one-half in number of the Claims in each impaired Class who are entitled to, and who <u>actually</u> vote on the Plan.  In the event the requisite acceptances are not obtained from impaired Classes, but at least one impaired Class does accept the Plan, the Court may nevertheless confirm the Plan if the Court finds that it is fair and equitable to the Class or Classes rejecting it.  If the Plan is confirmed, you will be bound by its terms even if you vote to reject the Plan or fail to vote.

Creditors holding Claims in Classes 2, 3, 4, and 6 are impaired and entitled to vote.  Only creditors whose Claims are Allowed, or are not Disputed, are entitled to vote on the Plan. Creditors holding Disputed Claims may vote only if they obtain temporary allowance of their Claims for voting purposes.  Ballots are enclosed with the Plan and Disclosure Statement.  To be counted, ballots must be returned to the Voting Agent:

> Shane Co. Balloting
> c/o Kurtzman Carson Consultants, LLC
> 2335 Alaska Avenue
> El Segundo, CA  90245
>
> (866) 381-9100

by **5:00 p.m.**, Pacific time, on _____, 2010 (the "<u>Voting Deadline</u>").

You are not required to vote, but only those votes actually received on or before the Voting Deadline be counted, either for or against the Plan.

Ballots have been mailed with this Disclosure Statement, or with summaries of the Disclosure Statement to creditors holding small claims, to the members of all impaired Classes. Classes which are not impaired under the Plan are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan. Classes which will receive nothing under the Plan are deemed to have rejected the Plan and therefore are not entitled to vote on the Plan.

*Changing Your Ballot*

If you have previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot, you may revoke your ballot and change your vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. If you submit more than one timely, properly completed ballot by the Voting Deadline, only the ballot which bears the latest date, will be counted.

*Withdrawing Your Ballot*

If you wish to withdraw your ballot, you may do so at any time prior to the Voting Deadline by delivering a written notice of withdrawal to the Voting Agent. To be valid, your notice of withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s); (ii) be signed by you in the same manner as the ballot being withdrawn; (iii) contain a certification that you own the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn; and (iv) be received by the Voting Agent by the Voting Deadline. The Company intends to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. The Company expressly reserves the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

*Resolution of Voting Irregularities*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Company, as applicable, in their sole discretion, which determination will be final and binding. The Company reserves the right to reject any and all ballots submitted by any of its creditors not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Company further reserves its rights to

waive any defects or irregularities or conditions of delivery as to any particular ballot by any of its creditors.

The Company's interpretation (including the ballot and the respective instructions thereto), will be final and binding on all parties, unless otherwise directed by the Bankruptcy Court. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Company or the Bankruptcy Court determines. Neither the Company nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots containing defects or irregularities will not be deemed to have been made until such defects or irregularities have been cured or waived.

## XII.   **RECOMMENDATION**

Shane Co. believes that the Plan provides the greatest possible distribution to creditors and provides the best alternative for preserving the value of the Property for the benefit of equity interest holders. Consequently, the Company recommends that all creditors vote to accept the Plan.

SHANE CO.
DEBTOR AND DEBTOR IN POSSESSION


*/s/ Thomas M. Shane*
Thomas M. Shane, President


FAIRFIELD AND WOODS, P.C.


*/s/ Caroline C. Fuller*
Caroline C. Fuller, #14403
Wells Fargo Centre
1700 Lincoln, Suite 2400
Denver, CO  80203-4524
Telephone:  (303) 830-2400
Facsimile:  (303) 830-1033
E-mail:  cfuller@fwlaw.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Attn: Gregg M. Galardi, Esq.
Telephone: (302) 651-3000
Facsimile: (302) 651-3001


ATTORNEYS FOR SHANE CO.

## **EXHIBIT A**

Company Financial Statements for Fiscal Years Ended January 31, 2009 and January 30 2010

EXHIBIT A - HISTORICAL FINANCIAL STATEMENTS

**Shane Co. - Debtor In Possession**
Unaudited Consolidated Internal Balance Sheets
($'s in 000's)

| | January 30, 2010 | January 31, 2009 |
|---|---|---|
| **ASSETS:** | | |
| Unrestricted Cash | $ 14,857 | $ 7,512 |
| Restricted Cash | 426 | 208 |
| Inventory, LIFO | 42,849 | 58,452 |
| Receivables Layaway | 5,273 | 5,091 |
| Receivable - Other | 630 | 530 |
| Receivables | 5,903 | 5,621 |
| Prepaid Expenses | 2,913 | 1,941 |
| Reorganization Professionals - Retainers and Other Reorganization Deposits | 873 | 1,384 |
| Total Current Assets | 67,821 | 75,118 |
| Fixed Assets, Cost | 60,565 | 60,543 |
| Accumulated Depreciation | (29,971) | (24,458) |
| Net Fixed Assets | 30,594 | 36,085 |
| Other Noncurrent Assets | 357 | 398 |
| Total Assets | $ 98,772 | $ 111,601 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT:** | | |
| Current Liabilities: | | |
| Accounts Payable | $ 7,782 | $ 2,638 |
| UMB Loan, Current Portion | 84 | 1,773 |
| Affiliate TMS Accruals, Post Petition | 1,267 | 67 |
| Other Accrued Liabilities | 6,578 | 7,149 |
| Deferred Profit/ Layaway, Net | 3,465 | 3,423 |
| Total Current Liabilities | 19,176 | 15,050 |
| Secured debt, M. Suresh & UMB Loan | 6,501 | 12,911 |
| Secured debt, Affiliate Corundum DIP Loan | 10,500 | 10,500 |
| Pre-petition, GUC Claims | 50,923 | 52,241 |
| Pre-petition, Affiliate TMS Unsecured Claims | 22,779 | 22,779 |
| Other Long Term Liabilities | 2,740 | 2,373 |
| Total Liabilities | 112,619 | 115,854 |
| Capital Stock | 9,749 | 9,749 |
| Contributions, Capital Stock | 10 | 10 |
| Total Common Stock | 9,759 | 9,759 |
| Accumulated Other Comprehensive Income | 101 | 37 |
| Accumulated Deficits | (23,707) | (14,049) |
| Total Stockholders' Deficit | (13,847) | (4,253) |
| Total Liabilities & Stockholders' Deficit | $ 98,772 | $ 111,601 |
| Comments: | | |
| Inventory, FIFO | $ 53,968 | $ 66,998 |

Financial statements are in accordance with Generally Accepted Accounting Principles (GAAP) except for primarily LIFO and layaway accounting for the Company's consolidated internal balance sheets and consolidated internal statements of operations with the omission of footnotes. As a result, this presentation is Non-GAAP.

## EXHIBIT A - HISTORICAL FINANCIAL STATEMENTS

**Shane Co. - Debtor In Possession**
Unaudited Consolidated Internal Statements of Operations
($'s in 000's)

| | For the Fiscal Twelve Months Ended | |
| | January 30, 2010 | January 31, 2009 |
|---|---|---|
| Net Sales | $ 165,708 | $ 212,499 |
| Cost of Sales | 93,373 | 121,664 |
| Gross Profit | 72,335 | 90,835 |
| Gross profit as % of net sales | 43.7% | 42.7% |
| Selling, General & Administrative Expenses | 74,451 | 99,440 |
| Loss Before Loss on Disposal of Assets, Impairments, Exit Costs and Bankruptcy Reorganization Costs | (2,116) | (8,605) |
| Loss on Disposal of Assets, Impairments Exit Costs and Bankruptcy Reorganization Costs, Net | 2,602 | 6,629 |
| Operating Loss | (4,718) | (15,234) |
| Interest Expense | 2,301 | 4,806 |
| Net Loss | $ (7,019) | $ (20,040) |
| Earnings (Loss) Before Interest Expense, Taxes, Loss on Disposal of Assets, Impairments, Exit Costs, Bankruptcy Reorganization Costs, Depreciation and Amortization | $ 4,250 | $ (1,496) |

Comment:

Financial statements are in accordance with Generally Accepted Accounting Principles (GAAP) except for primarily LIFO and layaway accounting for the Company's consolidated internal balance sheets and consolidated internal statements of operations with the omission of footnotes. As a result, this presentation is Non-GAAP.

## **EXHIBIT B**

Cash-Flow Projections

**EXHIBIT B - CASH FLOW PROJECTIONS**

The forecasted financial statements should be read in conjunction with the *Disclosure Statement to Debtor's Plan of Reorganization*. In addition attention is directed to *Section V. C. Implementation of Plan, Financial Projections and Valuation and Section VI. Risk Factors* in the Disclosure Statement.

Reorganized Shane Co.
Unaudited Consolidated Internal Statements of Cash Flows
($'s in 000's)

| | | For the Fiscal Twelve Months Ended | | | | |
|---|---|---|---|---|---|---|
| | 01/29/11 Forecast FY'11 | 01/28/12 Forecast FY'12 | 02/02/13 Forecast FY'13 | 02/01/14 Forecast FY'14 | 01/31/15 Forecast FY'15 | Totals for the 5 Year Period |
| *Sources (Uses) of Cash* | | | | | | |
| **CASH FLOWS FROM OPERATING ACTIVITES** | | | | | | |
| Net Income (Loss) | $ (4,028) $ | 2,101 $ | 7,101 $ | 8,416 $ | 10,433 $ | 24,023 |
| Depreciation, Amortization, and Other Non-Cash Activity, Net | 7,279 | 5,616 | 4,976 | 4,888 | 4,571 | 27,330 |
| Changes in Working Capital, Net | (1,318) | 1,875 | 784 | (345) | 963 | 1,959 |
| Changes in Other Assets and Liabilities, Net | 657 | 466 | (63) | (336) | (590) | 134 |
| **Cash Provided By (Used By) Operating Activities** | $ 2,590 $ | 10,058 $ | 12,798 $ | 12,623 $ | 15,377 $ | 53,446 |
| **CASH FLOWS FROM INVESTING ACTIVITES** | | | | | | |
| Capital Expenditures, Net of Proceeds from Asset Sales | (332) | (250) | (250) | (250) | (250) | (1,332) |
| **Cash Provided By (Used By) Investing Activities** | $ (332) $ | (250) $ | (250) $ | (250) $ | (250) $ | (1,332) |
| **CASH FLOWS FROM FINANCING ACTIVITES** | | | | | | |
| UMB Bank Secured Debt (Repayments) | (140) | - | - | - | - | (140) |
| Pre-Petition Secured Debt M. Suresh (Repayments) | (6,501) | - | - | - | - | (6,501) |
| Corundum Secured DIP Loan Proceeds From (Repayments) | 4,191 | - | - | - | - | 4,191 |
| Corundum Secured DIP loan, Payment In Kind (PIK) of Interest | 77 | 494 | 551 | 615 | 686 | 2,423 |
| Pre-Petition TMS Unsecured Notes PIK of Interest | 81 | 997 | 1,046 | 1,098 | 1,153 | 4,375 |
| Cure Cost, Convenience Claims, and Pre-petition GUC Claims (Repayments) | (8,335) | (10,000) | (11,000) | (11,000) | (11,972) | (52,307) |
| Shareholder Dividends: Tax Dividends and Equalization Dividends | - | (1,001) | (3,249) | (3,810) | (4,716) | (12,776) |
| **Cash Provided By (Used By) Financing Activities** | $ (10,627) $ | (9,510) $ | (12,652) $ | (13,097) $ | (14,849) $ | (60,735) |
| **Net Cash Flow** | $ (8,369) $ | 298 $ | (104) $ | (724) $ | 278 $ | (8,621) |
| **Beginning Cash Balance, Unrestricted** | 14,857 | 6,488 | 6,786 | 6,682 | 5,958 | 14,857 |
| **Ending Cash Balance, Unrestricted** | $ 6,488 $ | 6,786 $ | 6,682 $ | 5,958 $ | 6,236 $ | 6,236 |

Comment:

Certain interest expense accrued for recognition in Net Income (Loss) was not paid according to the Plan of Reorganization for Corundum and Pre-petition TMS Unsecured Notes (Payment In Kind or PIK). This financial activity, to not pay this accrued interest expense recognized in Net Income (Loss), is a source of cash adjustment. This PIK impact on cash is reflected in Cash Provided By (Used By) Financing Activities under the captions:

    Corundum secured DIP loan, Payment In Kind (PIK) of interest

    Pre-petition TMS unsecured notes PIK of Interest

Cure Cost, Convenience Claims, and Pre-Petition GUC Claims (Repayments): subsequent to FY '11, all repayments noted are to Pre-petition GUC Claims.

Financial statements are in accordance with Generally Accepted Accounting Principles (GAAP) except for primarily LIFO and layaway accounting for the Company's consolidated internal balance sheets, consolidated internal statements of operations, consolidated internal statements of cash flow with the omission of footnotes. As a result, this presentation is Non-GAAP.

**EXHIBIT B - CASH FLOW PROJECTIONS**

*The forecasted financial statements should be read in conjunction with the Disclosure Statement to Debtor's Plan of Reorganization.  In addition attention is directed to Section V. C. Implementation of Plan, Financial Projections and Valuation and Section VI. Risk Factors in the Disclosure Statement.*

Reorganized Shane Co.
Unaudited Consolidated Internal Balance Sheets
($'s in 000's)

| | 01/29/11 Forecast FY'11 | 01/28/12 Forecast FY'12 | 02/02/13 Forecast FY'13 | 02/01/14 Forecast FY'14 | 01/31/15 Forecast FY'15 |
|---|---|---|---|---|---|
| **ASSETS:** | | | | | |
| Current Assets: | | | | | |
| Unrestricted Cash | $ 6,488 | $ 6,786 | $ 6,682 | $ 5,958 | $ 6,236 |
| Restricted Cash | 444 | 444 | 444 | 444 | 444 |
| Inventory, LIFO | 47,498 | 49,450 | 49,450 | 49,450 | 49,450 |
| Receivables Layaway | 6,038 | 6,396 | 6,785 | 8,405 | 8,825 |
| Receivable - Other | 430 | 429 | 430 | 430 | 430 |
| Receivables | 6,468 | 6,825 | 7,215 | 8,835 | 9,255 |
| Prepaid Expenses | 3,292 | 3,260 | 3,229 | 3,198 | 3,168 |
| Reorganization Professionals - Retainers and and Other Reorganization Deposits | 428 | 428 | 428 | 428 | 428 |
| Total Current Assets | 64,618 | 67,193 | 67,448 | 68,313 | 68,981 |
| Fixed Assets, Cost | 60,904 | 61,154 | 61,404 | 61,654 | 61,904 |
| Accumulated Depreciation | (35,926) | (41,542) | (46,518) | (51,406) | (55,977) |
| Net Fixed Assets | 24,978 | 19,612 | 14,886 | 10,248 | 5,927 |
| Other Noncurrent Assets | 421 | 421 | 421 | 421 | 421 |
| Total Assets | $ 90,017 | $ 87,226 | $ 82,755 | $ 78,982 | $ 75,329 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT:** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable | $ 4,745 | $ 7,816 | $ 7,825 | $ 8,002 | $ 8,230 |
| UMB Loan, Current Portion | - | - | - | - | - |
| Affiliate TMS Accruals, Post Petition | 2,462 | 3,662 | 4,862 | 6,062 | 7,262 |
| Other Accrued Liabilities | 10,226 | 10,108 | 10,042 | 9,909 | 9,835 |
| Deferred Profit/ Layaway, Net | 3,998 | 3,998 | 3,998 | 3,998 | 3,998 |
| Total Current Liabilities | 21,431 | 25,584 | 26,727 | 27,971 | 29,325 |
| Secured debt, M. Suresh | - | - | - | - | - |
| Secured debt, Affiliate Corundum DIP Loan | 14,768 | 15,262 | 15,813 | 16,428 | 17,114 |
| Pre-petition, GUC Claims | 43,972 | 33,972 | 22,972 | 11,972 | - |
| Pre-petition, Affiliate TMS Unsecured Claims | 22,860 | 23,857 | 24,903 | 26,002 | 27,155 |
| Other Long Term Liabilities | 3,452 | 3,917 | 3,855 | 3,519 | 2,929 |
| Total Liabilities | 106,483 | 102,592 | 94,270 | 85,892 | 76,523 |
| Capital Stock | 9,749 | 9,749 | 9,749 | 9,749 | 9,749 |
| Contributions, Capital Stock | 10 | 10 | 10 | 10 | 10 |
| Total Common Stock | 9,759 | 9,759 | 9,759 | 9,759 | 9,759 |
| Accumulated Other Comprehensive Income | 111 | 111 | 111 | 111 | 111 |
| Accumulated Deficits | (26,336) | (25,236) | (21,385) | (16,780) | (11,064) |
| Total Stockholders' Deficit | (16,466) | (15,366) | (11,515) | (6,910) | (1,194) |
| Total Liabilities & Stockholders' Deficit | $ 90,017 | $ 87,226 | $ 82,755 | $ 78,982 | $ 75,329 |
| Comment: | | | | | |
| Inventory, FIFO | $ 56,048 | $ 58,000 | $ 58,000 | $ 58,000 | $ 58,000 |

Financial statements are in accordance with Generally Accepted Accounting Principles (GAAP) except for primarily LIFO and layaway accounting for the Company's consolidated internal balance sheets, consolidated internal statements of operations, consolidated internal statements of cash flow with the omission of footnotes.  As a result, this presentation is Non-GAAP.

**EXHIBIT B - CASH FLOW PROJECTIONS**

The forecasted financial statements should be read in conjunction with the *Disclosure Statement to Debtor's Plan of Reorganization*. In addition attention is directed to *Section V. C. Implementation of Plan, Financial Projections and Valuation and Section VI. Risk Factors* in the Disclosure Statement.

**Reorganized Shane Co.**
Unaudited Consolidated Internal Statements of Operations
($'s in 000's)

| | For the Fiscal Twelve Months Ended | | | | | |
|---|---|---|---|---|---|---|
| | 01/29/11 Forecast FY'11 | 01/28/12 Forecast FY'12 | 02/02/13 Forecast FY'13 | 02/01/14 Forecast FY'14 | 01/31/15 Forecast FY'15 | Totals for the 5 Year Period |
| Net Sales | $ 212,008 | $ 227,166 | $ 247,099 | $ 253,044 | $ 265,696 | $ 1,205,013 |
| Cost of Sales | 128,157 | 136,224 | 147,071 | 150,473 | 157,997 | 719,922 |
| Gross Profit | 83,851 | 90,942 | 100,028 | 102,571 | 107,699 | 485,091 |
| Gross Profit as % of Net Sales | 39.6% | 40.0% | 40.5% | 40.5% | 40.5% | 40.3% |
| Selling, General & Administrative Expenses | 82,128 | 86,102 | 90,175 | 91,287 | 93,973 | 443,665 |
| Profit Before Loss on Disposal of Assets, Impairments, Exit Costs and Bankruptcy Reorganization Costs | 1,723 | 4,840 | 9,853 | 11,284 | 13,726 | 41,426 |
| Loss on Disposal of Assets, Impairments Exit Costs and Bankruptcy Reorganization Costs, Net | 4,135 | - | - | - | - | 4,135 |
| Operating Income (Loss) | (2,412) | 4,840 | 9,853 | 11,284 | 13,726 | 37,291 |
| Interest Expense | 1,616 | 2,739 | 2,752 | 2,868 | 3,293 | 13,268 |
| Net Income (Loss) | $ (4,028) | $ 2,101 | $ 7,101 | $ 8,416 | $ 10,433 | $ 24,023 |
| Earnings Before Interest Expense, Taxes, Loss on Disposal of Assets, Impairments, Exit Costs, Bankruptcy Reorganization Costs, Depreciation and Amortization | $ 7,821 | $ 10,576 | $ 14,949 | $ 16,292 | $ 18,417 | $ 68,055 |

Comment:

Financial statements are in accordance with Generally Accepted Accounting Principles (GAAP) except for primarily LIFO and layaway accounting for the Company's consolidated internal balance sheets, consolidated internal statements of operations, consolidated internal statements of cash flow with the omission of footnotes. As a result, this presentation is Non-GAAP.

# **EXHIBIT C**

Liquidation Analysis

**EXHIBIT C - LIQUIDATION ANALYSIS**

Shane Co. - Debtor In Possession

| | ESTIMATED LIQUIDATION PROCEEDS - $000's | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | Book Value at 06/25/10 | Estimated Recovery % | | | Estimated Liquidation Value | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | | Mid | | High | |
| Unrestricted Cash | $ 4,603 | 100.0% | 100.0% | 100.0% | $ 4,603 | $ | 4,603 | $ | 4,603 | |
| Restricted Cash | $ 99 | 0.0% | 0.0% | 0.0% | $ - | $ | - | $ | - | |
| Inventory, Net of Put Backs, Net of Layaway Returns, and Liquidations | $ 57,854 | 45.9% | 55.8% | 67.8% | $ 26,536 | $ | 32,303 | $ | 39,225 | |
| Receivables | $ 6,245 | 61.8% | 76.0% | 95.0% | $ 3,857 | $ | 4,747 | $ | 5,933 | |
| Prepaid Expenses | $ 3,218 | 0.0% | 0.0% | 0.0% | $ - | $ | - | $ | - | |
| Other Reorganization Deposits | $ 865 | 58.9% | 58.9% | 58.9% | $ 509 | $ | 509 | $ | 509 | |
| Total Current Assets | $ 72,884 | 48.7% | 57.8% | 69.0% | $ 35,505 | $ | 42,162 | $ | 50,270 | |
| Net Fixed Assets | $ 28,901 | 2.0% | 2.5% | 3.1% | $ 581 | $ | 715 | $ | 894 | |
| Intangible Assets and Trademarks | $ - | 0.0% | 0.0% | 0.0% | $ - | $ | - | $ | - | |
| Other Noncurrent Assets | $ 737 | 100.0% | 100.0% | 100.0% | $ 737 | $ | 737 | $ | 737 | |
| Gross Proceeds Available for Payment or Distribution | $ 102,522 | 35.9% | 42.5% | 50.6% | $ 36,823 | $ | 43,614 | $ | 51,901 | |

Continued on next page.

## EXHIBIT C - LIQUIDATION ANALYSIS

**Shane Co. - Debtor In Possession**

### ESTIMATED LIQUIDATION EXPENSES & CLAIMS - $000's

| | Total | Estimated Costs if Different by Estimated Levels | | | Estimated Liquidation Expense & Claims | | |
|---|---|---|---|---|---|---|---|
| | | Low | Mid | High | Low | Mid | High |
| Gross Proceeds Available for Payment or Distribution (from page 1) | | | | | 36,823 | 43,614 | 51,901 |
| Senior Secured Claims – DIP Balance Outstanding, Accrued Interest & Fees | (10,632) | | | | (10,632) | (10,632) | (10,632) |
| Net Proceeds After Payment or Distribution | | | | | 26,191 | 32,982 | 41,269 |
| Secured Claims - M. Suresh Balance Outstanding & Fees | (3,951) | | | | (3,951) | (3,951) | (3,951) |
| Net Proceeds After Payment or Distribution | | | | | 22,240 | 29,031 | 37,318 |
| Admin Costs - Cha Trustee Fees (costs vary by total distributions completed by Trustee) | | (1,128) | (1,332) | (1,580) | | | |
| Trustee Professional Fees | (300) | | | | | | |
| Overhead Expenses of GOB | (1,704) | | | | | | |
| Overhead Expenses of Wind Down | (1,095) | | | | | | |
| | (3,099) | (3,099) | (3,099) | (3,099) | | | |
| Admin Costs - Chapter 7 | | (4,227) | (4,431) | (4,679) | (4,227) | (4,431) | (4,679) |
| Net Proceeds After Payment or Distribution | | | | | 18,013 | 24,600 | 32,639 |
| *Admin Costs - Cha* Sales Taxes, Payroll Taxes, and Personal Property Taxes | (1,049) | | | | | | |
| Payroll Straddling Closing | (389) | | | | | | |
| Employee claims - Vacation | (360) | | | | | | |
| Employee claims - Medical | (443) | | | | | | |
| Employee claims - WARN | - | | | | | | |
| Accounts Payable M. Suresh Post Petition 1-12-09 | (2,855) | | | | | | |
| Accounts Payable Post Petition 1-12-09 | (2,281) | | | | | | |
| Assumed Leases - Admin claims | (3,329) | | | | | | |
| Executory Contract Rejection Claims | (1,232) | | | | | | |
| Admin Costs - Chapter 11 | (11,938) | | | | (11,938) | (11,938) | (11,938) |
| Net Proceeds After Payment or Distribution | | | | | 6,075 | 12,662 | 20,701 |
| Secured Tax Claims | (110) | | | | | | |
| Priority Unsecured Claims | (88) | | | | | | |
| Secured Tax Claims & Priority Unsecured Claims | (198) | | | | (198) | (198) | (198) |
| Net Proceeds After Payment or Distribution | | | | | 5,877 | 12,464 | 20,503 |

| | Total | % of Total Unsecured | % Recovered | | | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Med | High | | | |
| Unsecured Claims: Pre-Petition Claims 1-12-09 | (57,366) | 69% | | | | | | |
| Unsecured Claims Post Petition 1-12-09 | (1,657) | 3% | | | | | | |
| GUC Class 5 Total | (59,023) | 71% | 7.0% | 14.9% | 24.6% | (4,157) | (8,817) | (14,503) |
| TMS Unsecured Claims Pre-Petition 1-12-09 | (22,779) | 27% | | | | | | |
| TMS Unsecured Claims Post Pre-Petition 1-12-09 | (1,642) | 2% | | | | | | |
| TMS Unsecured Claims Total | (24,421) | 29% | 7.0% | 14.9% | 24.6% | (1,720) | (3,647) | (6,000) |
| Total Unsecured Claims | (83,444) | 100% | | | | | | |
| Total Unsecured Claim Distributions | | | 7.0% | 14.9% | 24.6% | (5,877) | (12,464) | (20,503) |
| Net Proceeds After Payment or Distribution | | | | | | - | - | - |