**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Howard R. Tallman**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 09-10367 HRT |
| SHANE CO., ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | |

**ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC**

This case comes before the Court on Debtor's *Objection to Claim [87] Filed by IBC Denver IV, LLC, Assigned to Lapis Advisers, LP* (Docket #857) (the "Objection").

## I. FACTS

The parties filed their *Stipulation of Facts with Respect to Debtor's Objection to Claim of Lapis Advisers LP* (docket #1097) (the "Stipulation") and stipulated to the following facts:

1. On or about December 19, 2006, IBC Denver IV, LLC ("IBC"), as lessor, and Shane, as lessee, entered into a Lease Agreement (the "Original Lease") pursuant to which Shane leased approximately 54,280 square feet of space in a building located at 8532 Concord Center Drive, Centennial, Colorado ("Building One"). The Original Lease provided for a term of 126 months commencing on February 1, 2007.

2. On or about February 14, 2007, IBC and Shane entered into a First Amendment to Lease (the "First Amendment," and together with the Original Lease, "the Lease"), pursuant to which Shane leased an additional 42,040 square feet of space in a building located at 8530 Concord Center Drive, Centennial, Colorado ("Building Two") (Building One and Building Two are collectively referred to as the "Leased Premises").

3. Pursuant to the First Amendment, the term of the Lease was extended from July 31, 2017 to July 31, 2019. The Lease required Shane to pay monthly Base Rent[1] for the Leased Premises according to the following schedule:

    | | |
    |---|---|
    | Months 1-6 | $0.00 |
    | Months 7-18 | $54,275.33 |
    | Months 19-30 | $55,632.22 |
    | Months 31-42 | $57,023.02 |
    | Months 43-54 | $58,448.60 |
    | Months 55-66 | $59,909.81 |

---

[1] Capitalized terms not otherwise defined have the meaning ascribed to them in the document to which they refer.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

| | |
|---|---|
| Months 67-78 | $61,407.56 |
| Months 79-90 | $62,942.75 |
| Months 91-102 | $64,516.32 |
| Months 103-114 | $66,129.22 |
| Months 115-126 | $67,782.45 |
| Months 127-138 | $69,477.02 |
| Months 139-150 | $71,213.94 |

4. In addition to Base Rent, the Lease required Shane to pay IBC on a monthly basis its Proportionate Share of Operating Expenses related to the Leased Premises, including Taxes, Insurance, Common Area Maintenance, Utilities and Management Fees. Based on the square footage of the two Buildings, Building One accounted for 43.646% of the Operating Expenses and Building Two accounted for 56.354% of the Operating Expenses. Under the terms of the Lease, Shane was responsible for payment of 88.725% of the total Operating Expenses for Building One and Building Two.

5. Shane had intended to use the Leased Premises as its corporate headquarters and as a storage facility for its jewelry inventory. However, at some time prior to the commencement date of the Lease, Shane advised IBC that it would not be taking possession of the Leased Premises and instead would explore options to sublease the Premises. With the cooperation of IBC, Shane engaged a commercial real estate broker for the purpose of identifying one or more sub-tenants for the Leased Premises. Those efforts were not successful.

6. Despite its decision not to occupy the Leased Premises, Shane made the required Lease payments through December 2008. Shane did not make the required Lease payments for January 2009.

7. Shane filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 12, 2009. Thereafter, Shane filed a motion to reject the Lease, which was approved by Order of the Bankruptcy Court dated February 26, 2009, effective nunc pro tunc as of the petition date. As of the petition date, IBC was owed $86,304.46 by Shane on account of rent due under the Lease.

8. On or about April 20, 2009, IBC filed its Proof of Claim (the "Claim") (designated as Claim No. 87-1 on the Court's docket) in the amount of $1,949,052.44 consisting of $86,304.46 in unpaid pre-petition rent and $1,862,747.80 for damages arising by virtue of Shane's rejection of the Lease.

9. On or about May 17, 2010, IBC transferred and assigned the Claim to Lapis. Lapis is now the owner and holder of the Claim.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

10. On or about October 8, 2010, the Debtor filed its Objection to Claim 127 [sic] Filed by IBC Denver IV, LLC, Assigned to Lapis Advisers, LP.

11. On or about November 8, 2010, Lapis filed its Response of Lapis Advisers, LP to Debtor's Objection to Claim.

12. Subsequent to the rejection of the Lease, IBC engaged Frederick Ross Company ("Frederick Ross"), a commercial real estate brokerage firm, to identify replacement tenant(s) and/or purchaser(s) for the Leased Premises.

13. In February 2010, IBC consummated a sale of Building Two to Case Concord, LP for a gross purchase price of $3,800,000.00. The sale of Building Two closed on February 16, 2010. IBC incurred and paid a sale commission of $184,947.50 to Frederick Ross in connection with the sale of Building Two.

14. On November 1, 2009, IBC entered into a lease with Raceway Partners LLC ("Raceway") pursuant to which Raceway leased Building One for a 63 month term commencing November 13, 2009 and terminating on February 12, 2015 (the "Raceway Lease"). IBC incurred and paid leasing commissions of $117,651.08 in connection with the lease of Building One.

15. Raceway has an option to extend the Raceway Lease for one additional five year term at the then prevailing market rate. To date, Raceway has not advised IBC whether or not it intends to exercise its option to extend the Raceway Lease.

16. The Raceway Lease provides for payment of monthly Base Rent pursuant to the following schedule:

| | |
|---|---|
| Months 1-3 | $0.00 |
| Months 4-12 | $26,913.83 |
| Months 13-24 | $27,721.25 |
| Months 25-36 | $28,552.89 |
| Months 37-48 | $29,409.47 |
| Months 49-60 | $30,291.76 |
| Months 61-63 | $31,200.51 |

17. In addition, Raceway is required to pay certain defined Operating Expenses related to Building One.

18. Assuming Raceway fully performs its obligations under the terms of the Raceway Lease, it will pay to IBC over the full initial term the sum of $2,723,568.30 consisting of rent and reimbursement of Operating Expenses.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

19. On November 3, 2010, Lapis filed its Motion Pursuant to Bankruptcy Rule 3018(a) For Order Temporarily Allowing Claim for Purpose of Voting on Plan of Reorganization [Docket No. 901-4]. In support of that Motion, Lapis filed the Declaration of Brian C. Mott, a principal of IBC (the "Mott Declaration"). The Mott Declaration set forth the following calculation of the Claim:

| | |
|---|---:|
| Unpaid rent plus Operating Expenses (increased by 3% per year) due for remaining term of Lease: | |
| Months 25-30 | $520,172.52 |
| Months 31-150 | $11,898,147.34 |
| Sub-total of gross claim | $12,418,319.86 |
| *Less:* | |
| Sale Proceeds (Building Two) | $3,800,000.00 |
| Rent and Operating Expenses due from Raceway (Building One) | $2,723,568.30 |
| Net claim, before application of Section 502(b)(6) cap ($12,418,319.86 less (a) $3,800,000.00 and (b) $2,723,568.30) | $5,894,751.56 |
| Rent reserved for 3 years of Lease Months 25-60 | $3,228,811.89 |
| 15% of gross claim ($12,418,319.86 x 15%) | $1,862,747.80 |
| *Plus:* | |
| Unpaid pre-petition rent | $86,304.46 |
| *Total:* | |
| 15% of gross claim plus pre-petition rent | $1,949,052.44 |

20. On July 21, 2011, Lapis filed its Motion for Leave to File Amended Proof of Claim ("Motion for Leave"). On July 25, 2011, the Court entered its Order granting the Motion for Leave. The Amended Proof of Claim attached to the Motion for Leave sets forth Lapis's calculation of IBC's mitigation of damages resulting from the post-rejection sale of Building One ($3,800,000 gross sale proceeds) and the lease of Building Two

($2,723,568.00 of projected future rental income and reimbursement of operating expenses payable by Raceway Partners, LLC), less brokerage commissions of $302,597.00 paid by IBC in connection with those two transactions According to Lapis's calculations, the net actual damages resulting from the rejection of the Lease total $6,197,348.86, exclusive of unpaid pre-petition rent. The difference between the actual rejection damages as set forth in the Mott Declaration and in the Amended Proof of Claim is that the Mott Declaration, unlike the Amended Proof of Claim, did not reflect the brokerage commissions incurred by IBC in connection with the sale of Building One and the lease of Building Two.

21. For calendar year 2008, Shane's share of Operating Expenses for the Leased Premises was $293,589.24, which included $187,579 on account of Real Estate Taxes.

22. For calendar year 2009, Shane's share of Real Estate Taxes for the Leased Premises was $271,500.

23. The Operating Expenses payable under the Lease and attributable to Building Two for the period from February 2010 through the end of the Lease on July 21, 2019, total $1,846,185.00.

24. The Operating Expenses payable under the Lease constitute additional rent and were "pass through" expenses in that the Lease provided that such Operating Expenses would be paid or reimbursed by Shane without IBC either recognizing a profit or loss with respect thereto.

## II. DISCUSSION

A. The Lapis Damages Claim.

Under 11 U.S.C. § 365(g)(1), the Court treats Shane's rejection of its Lease with IBC as a breach of the Lease occurring immediately prior to the petition date. Thus, Lapis (as IBC's assignee) is entitled to assert a claim in this proceeding for the damages resulting from the breach. Lapis's claim for damages is determined under the terms of the Lease and under applicable non-bankruptcy law. *In Re Highland Superstores*, 154 F.3d 573, 579 (6th Cir. 1998) (citing *In re Gantos, Inc.*, 176 B.R. 793, 795 (Bankr. W.D. Mich. 1995); *In re Iron-Oak Supply Corp.*, 169 B.R. 414, 418-20 (Bankr. E.D. Cal. 1994); *In re Financial News Network, Inc.*, 149 B.R. 348, 351 (Bankr. S.D. N.Y. 1993); *In re Conston Corp., Inc.*, 130 B.R. 449, 453 (Bankr. E.D. Pa. 1991); *In re Goldblatt Bros., Inc.*, 66 B.R. 337, 346 (Bankr. N.D. Ill. 1986).

The measure of damages in Colorado for breach of a real property lease "is the amount it takes to place the landlord in the position he would have occupied had the breach not occurred, taking into account the landlord's duty to mitigate." *Schneiker v. Gordon,* 732 P.2d 603, 612

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

(Colo. 1987). *See, also, Summit Foods, Inc. v. Greyhound Food Management, Inc.*, 752 F. Supp. 363, 366 (D. Colo. 1990); *La Casa Nino, Inc. v. Plaza Esteban*, 762 P.2d 669, 672 (Colo. 1988).

> Usually this will be the difference between the rent reserved in the lease and the reasonable rental value of the premises for the duration of the term of the lease, plus any other consequential damages caused by the breach. . . . If the landlord has avoided any cost by not having to perform, that cost should be deducted from his recovery in order to place him in the position he would have occupied had the tenant performed.

*Schneiker,* 732 P.2d at 612.

The Court will not undertake to liquidate the full amount of Lapis's damages claim under the Lease and Colorado contract law. The stipulated facts do not allow the Court to make that determination without the aid of expert analysis to compare the present value of the Lease to the current reasonable rental value of the premises.[2]

More importantly, for the reasons discussed below, the Court rejects the Debtor's assertion that the damages cap is calculated based on the state law damages claim after taking mitigation into account instead of being calculated based on the rent reserved in the Lease. Consequently, the Court's calculation of the damages cap under § 502(b)(6) depends only upon the rent reserved and is not dependent upon the amount of the state law damages claim. In a case like this one, where the § 502(b)(6) cap, calculated on the rent reserved under the Lease, is less than either parties' estimation of the damages claim, calculating the precise amount of state law damages is unnecessary. Neither party believes that Lapis's state law claim for damages is less than its estimate of $6,197,348.86.[3] Because the Court calculates the § 502(b)(6) cap to be a lesser figure than either the Debtor's or Lapis's calculation of actual damages, the precise damages figure is a moot point.

---

[2] It does appear that Debtor retained an expert to provide an analysis of Lapis' claim. However, Debtor appears to place no reliance on it's expert's report.

[3] According to Debtor's objection to Lapis's amended proof of claim, its "actual damages under Colorado law are approximately $7,156,199." Lapis's amended proof of claim alleges actual damages of $6,197,348.86.

Page 6 of 17

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

B.  Application of 11 U.S.C. § 502(b)(6).

The operation of the cap on landlord damages under § 502(b)(6) is a matter of first impression for this Court.[4]  The Bankruptcy Code sets out the formula for capping a landlord's claim for lease rejection damages as follows:

> (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.
> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that–
> . . .
>> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--
>>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of–
>>>> (i) the date of the filing of the petition; and
>>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

---

[4] Landlord damages claims have been addressed by cases decided in the Tenth Circuit Court of Appeals and in this district but those cases did not address the issues that are currently before this Court.  In *C.D. Stimson Co., v. Porter (In re Save-Rite Drug Stores)*, 195 F.2d 410 (10th Cir. 1952), the court's focus was on calculation of the landlord's damages claim under state law.  It did not address the operation of the damages cap under the Bankruptcy Act.  In the case of *In re Storage Technology Corp.*, 77 B.R. 824 (Bankr. D. Colo. 1986), the court held that "the actual damage claim of [the landlord] for termination of the lease, whether for non-payment of rent, taxes, costs, attorney's fees, or other financial covenants such as the Residual Guarantee, are limited by the damage cap in § 502(b)(6)(A)." *Id*. at 825.  It also held that the "rent reserved" under the lease did not include attorney fees and other financial covenants unrelated to the value of the real estate.  *Id*.  Thus, its focus was on what damages are subject to the cap and not on how the cap is calculated.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

11 U.S.C. § 502(b)(6). In summary, Lapis' Lease rejection damages are capped at the greater of (1) the amount of rent due for the year following the effective date of the rejection or (2) the rent due for 15% of the remaining Lease term up to three years, in addition to delinquent pre-petition rent.

The Court's reading of § 502(b)(6)(A) is at odds with the majority of courts with respect to calculation of the 15% limitation. Courts frequently calculate the amount of *rent* due over the remaining term of the lease and multiply that amount times 15%. *In re USinternetworking, Inc.*, 291 B.R. 378, 380 (Bankr. D. Md. 2003) (citing *In re Today's Woman of Florida, Inc.*, 195 B.R. 506 (Bankr. M.D. Fl. 1996); *In re Gantos*, 176 B.R. 793 (Bankr. W.D. Mich. 1995); *In re Financial News Network, Inc.*, 149 B.R. 348 (Bankr. S.D. N.Y. 1993); *In re Communicall Cent., Inc.*, 106 B.R. 540 (Bankr. N.D. Ill. 1989); *In re McLean Enter., Inc.*, 105 B.R. 928 (Bank. W.D. Mo. 1989)). That is the method that Lapis used to calculate the limitation on its claim but, in the Court's view, the language of § 502(b)(6)(A) does not support such an interpretation. When the language pertaining to the one year and three year limitations is omitted, what remains is: "the rent reserved . . . for . . . 15 percent . . . of the remaining term of such lease . . . ." Fifteen percent of the remaining term of the lease is plainly a reference to an amount of *time* not money.

The Court observes the "cardinal rule that a statute is to be read as a whole . . . since the meaning of statutory language, plain or not, depends on context." *Conroy v. Aniskoff*, 507 U.S. 511, 515 (1993) (citing *Massachusetts v. Morash*, 490 U.S. 107, 115 (1993); *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991)). Interpreting the 15% calculation as applying to the remaining amount of *rent* as opposed to a period of *time* yields a reading of the subsection that is internally inconsistent. It cannot be reasonably argued that the phrase "the rent reserved by such lease . . . for . . . one year . . ." refers to anything other than rent due for a one year period of *time*. Nor can "the rent reserved by such lease . . . not to exceed three years, of the remaining term of such lease . . ." be reasonably read to refer to anything other than a limitation based upon the rent due for a three year period of *time*. To read § 502(b)(6)(A) as referring to 15% of the total rent due over the full remaining term of the lease is inconsistent with the natural reading of the remainder of that subsection. In the Court's view, "the rent reserved . . . for . . . 15 percent . . . of the remaining term of such lease . . ." must be read as referring to rent due for that specified period of *time* in order to be consistent with the surrounding language.

In practice, by reading the 15% limitation consistently with the remainder of § 502(b)(6)(A) as a reference to a period of time, any lease with a remaining term of 80 months or less is subject to a cap of one year of rent[5] and any lease with a remaining term of 240 months

---

[5] 15% of 80 months equals 12 months.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

or more will be subject to a cap of three years rent.[6] Those in between are capped at the rent due for 15% of the remaining lease term. *In re Iron-Oak Supply Corp.*, 169 B.R. 414, 419 n.8 (Bankr. E.D. Cal. 1994).

The Court is not alone in its interpretation. The court in *In re Allegheny Intern., Inc.*, 145 B.R. 823 (W.D. Pa. 1992), considering an appeal of a bankruptcy court opinion that put the interpretation of § 502(b)(6)(A) at issue stated:

> [W]e agree with the bankruptcy court's interpretation of § 502(b)(6). As that court explained, § 502 generally speaks in terms of time periods for which rent is due after termination of the lease. Specifically, the statute provides that claims cannot exceed the greater of one year, or 15 percent, not to exceed three years, of the remaining term, following the earlier of the date of the filing of the petition and the date surrendered. The statute is written in terms of time. The bankruptcy court's analysis of the legislative history demonstrates that Congress intended the phrase "remaining term" to be a measure of time, not rent.

*Id.* at 828. *See, also, In re PPI Enterprises, Inc.*, 324 F.3d 197, 207 (3rd Cir. 2003) ("Under § 502(b)(6), a landlord-creditor is entitled to rent reserved from the greater of (1) one lease year or (2) fifteen percent, not to exceed three years, of the remaining lease term."). Collier also finds that the minority view as expressed in *Allegheny* is more consistent with the statutory language:

> The apparent majority view, however, does not appear to be in accord with the language of the statute. The 15 percent limitation of section 502(b)(6) speaks in terms of time, not in terms of rent: "the rent reserved, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease." Grammatically, the "greater of" phrase contemplates two time periods, one year and 15 percent of the remaining term. But the latter period (15 percent of the remaining term) is further limited to three years, so that if the remaining lease term exceeds 20 years, the allowable damage claim will not increase. The paraphrasing of this provision in the legislative history[7] supports this interpretation. This reading therefore appears to be the better view.

COLLIER ON BANKRUPTCY ¶502.03[7][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

---

[6] 15% of 240 months equals 36 months.

[7] *See infra* note 8 for the legislative history referenced in *Allegheny* and by COLLIER.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

*1. The Effect of Mitigation on the § 502(b)(6) Damages Cap*

The primary focus of the parties' dispute with respect to Lapis's claim as stated by Lapis in its opening brief is "[s]hould the calculation of the lease rejection damages cap under 11 U.S.C. § 502(b)(6) be based upon the gross rent reserved under the lease, or upon the net damages suffered by the lessor after mitigation of its damages?" The Debtor takes the position that the cap on Lapis's damages claim should be calculated by taking 15% of Lapis's damages after reducing the damages amount by the value of Lapis's mitigation efforts. Lapis would restrict the question of mitigation to the calculation of its damages claim under its Lease and under state law. It would not take mitigation into account in calculating the § 502(b)(6) damages cap.

To resolve the dispute, the Court looks first to the case of *Oldden v. Tonto Realty Corp.*, 143 F.2d 916 (2nd Cir. 1944). *Oldden* was decided approximately ten years following the introduction of a landlord damages cap under the Bankruptcy Act. It is an important case in two respects. It is cited in the legislative history to 11 U.S.C. § 502(b)(7)[8] (as the landlord damages

---

[8] Paragraph (7), derived from current law, limits the damages allowable to a landlord of the debtor. The history of this provision is set out at length in *Oldden v. Tonto Realty Co.*, 143 F.2d 916 (2d Cir. 1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. The damages a landlord may assert from termination of a lease are limited to the rent reserved for the greater of one year or ten percent of the remaining lease term, not to exceed three years, after the earlier of the date of the filing of the petition and the date of surrender or repossession in a chapter 7 case and 3 years lease payments in a chapter 9, 11, or 13 case. The sliding scale formula for chapter 7 cases is new and designed to protect the long-term lessor. This subsection does not apply to limit administrative expense claims for use of the leased premises to which the landlord is otherwise entitled.

This paragraph will not overrule *Oldden*, or the proposition for which it has been read to stand: To the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate. Moreover, his allowed claim is for his total damages, as limited by this paragraph. By virtue of proposed 11 U.S.C. 506(a) and 506(d), the

(continued...)

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

cap was originally designated in the 1978 Bankruptcy Code), which states that nothing in the new codification is intended to overrule *Oldden*. Also, it is relevant to the instant dispute because it is an example of a case where the allowable claim calculated under the cap on a landlord damages claims was later reduced further by application of the landlord's damages deposit.

The question in *Oldden* was "whether a landlord is required to deduct the amount of security held under a lease from the total damages provided by the lease or from the total claim allowable under Sec. 63, sub. a(9) of the Bankruptcy Act"[9] (predecessor to the current

---

[8](...continued)
> claim will be divided into a secured portion and an unsecured portion in those cases in which the deposit that the landlord holds is less than his damages. As under *Oldden*, he will not be permitted to offset his actual damages against his security deposit and then claim for the balance under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph.

H.R. Rep. 95-595, at 318 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309. The provision that originally appeared in § 502(b)(7) was relocated to § 502(b)(6) as a result of changes made in the Bankruptcy Amendments and Federal Judgeship Act of 1984, PL 98-353. The ten percent figure cited in the legislative history to the provision as it originally appeared in the 1978 Bankruptcy Code was later changed to the current fifteen percent.

[9] The *Oldden* court quoted the language of Section 63, sub. a(9) of the Bankruptcy Act:
> By amendment of the Bankruptcy Act in 1934, now Sec. 63, sub. a(9), 11 U.S.C.A. § 103, sub. a(9), however, there were added to the allowable claims in bankruptcy claims for anticipatory breach of contract, including unexpired leases of realty, but with the limitation that a landlord's claim for damages upon the rejection of an unexpired lease or 'for damages or indemnity under a covenant contained in such lease shall in no event be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after bankruptcy, plus an amount

(continued...)

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

§ 502(b)(6)). *Id*. at 918. The Second Circuit held that the landlord's allowable claim, calculated under the damages cap, must be reduced by the amount of the damage deposit. *Id*. at 920-21 ("The contrary result would mean that a landlord with security would be able to exceed the statutory limit by as much as the security he holds, and that landlords would receive different treatment in bankruptcy proceedings, depending upon the existence and size of the security in their possession."). *Oldden* specifically dealt with a security deposit. It did not address the issue currently before this Court of a landlord's post-termination mitigation efforts.

In the case of *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197 (3rd Cir. 2003), the Third Circuit relied on *Oldden*. In that case, the court extended the holding in *Oldden* to require the proceeds of a standby letter of credit, given as security against the tenant's default, to be applied to reduce the § 502(b)(6) damages cap. *Id*. at 209-210 ("we find the parties intended the letter of credit to serve as a security deposit.").

If a security deposit or a letter of credit is simply a form of mitigation, then the Debtor's position might be well taken. But they are not. The reported cases have drawn the line at security deposits and analogous forms of security. Even full payments of post-petition rent made by a debtor-in-possession or a chapter 7 trustee do not reduce the allowable portion of the landlord's damages claim under § 506(b)(6). *See, e.g., In re First Alliance Corp.* 140 B.R. 531, 533 (B.A.P. 9th Cir. 1992); *In re Atlantic Container Corp.*, 133 B.R. 980, 989 (Bankr. N.D. Ill. 1991).

The court in *In re Atlantic Container Corp.* explained the distinction:

> It is well-settled that a security deposit held by a lessor on a rejected lease must be applied against the maximum claim for lease termination damages allowed to the lessor under § 502(b)(6). The legislative history of § 502(b)(6) unequivocally supports this treatment of security deposits. Furthermore, this treatment of security deposits is consistent with the security deposit's traditional function. A landlord is a secured creditor to the extent of any security deposit it holds. As a secured or partially secured creditor, the landlord must satisfy its claim against the lessee out of the security it holds before asserting a claim against the lessee's general assets.
> In contrast, post-petition rent which a landlord receives from a tenant to whom the property has been relet is not applied in satisfaction of the landlord's

---

[9](...continued)
    equal to the unpaid rent accrued, without acceleration, up to such date.'

*Oldden v. Tonto Realty Corp.* 143 F.2d at 917.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

>   maximum allowable claim under § 502(b)(6). Instead, such post-petition rent payments are deducted from the landlord's total actual lease termination damages, before the § 502(b)(6) cap is applied. The primary damage a landlord suffers upon termination of a lease is the loss of the future rental income the landlord expected to receive under the terminated lease. The landlord can mitigate these damages by reletting the property. Any rent the landlord receives from the property's new tenant reduces the landlord's total actual lease termination damages.

*In re Atlantic Container Corp.*, 133 B.R. at 989-90 (citations omitted). The legislative history referenced in *Atlantic Container* comes from H.R. Rep. 95-595, at 318 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963:

>   By virtue of proposed 11 U.S.C. 506(a) and 506(d), the [landlord's] claim will be divided into a secured portion and an unsecured portion in those cases in which the deposit that the landlord holds is less than his damages. As under *Oldden*, he will not be permitted to offset his actual damages against his security deposit and then claim for the balance under this paragraph. Rather, his security deposit will be applied in satisfaction of the claim that is allowed under this paragraph.

*Id.* at 6309.

The calculation of damages is a separate and distinct question from the cap on those damages. *In re USinternetworking, Inc.*, 291 B.R. 378, 380 (Bankr. D. Md. 2003) ("Most courts agree . . . that Section 502(b)(6)(A) is not a formula for calculating damages; it is simply a method to cap damages calculated under the terms of the lease and state law.") (citing *Steven Windsor, Inc.*, 201 B.R. 133, 135 (Bankr. D. Md. 1996)). *See also C. D. Stimson Co. v. Porter (In re Save-Rite Drug Stores)*, 195 F.2d 410, 413 (10th Cir. 1952) ("The Federal law provides no formula for the ascertainment of the allowable damages. It merely qualifies and limits the lessor's claim for damages . . . .").

*Oldden* and its progeny do not alter that distinction. Under *Oldden*, once a court has calculated the allowable portion of a landlord's damages claim under § 502(b)(6), because a landlord with a security deposit is a secured creditor, it must first look to its collateral for satisfaction of its claim. Thereafter, if some portion of its allowed claim remains unsatisfied, it may assert the remainder of its claim against the assets of the estate. *In re Atlantic Container Corp.*, 133 B.R. at 989-90 (citations omitted).

"Courts are obligated to refrain from embellishing statutes by inserting language that Congress has opted to omit." *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000) (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)). The effect of mitigation is an element of the calculation of damages under state law and is properly considered in the calculation of damages. But to import mitigation into the calculation of the cap set out in

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

§ 502(b)(6) would be to judicially amend a statute that is plain on its face. The statutory language is devoid of any reference to – or even logical suggestion of – taking mitigation into account in calculating the damages cap under § 502(b)(6).

The statute speaks of "the rent reserved by such lease" for one year or for 15% of the remaining term, whichever is greater, not to exceed three years. The calculations required under § 502(b)(6) are not complicated and may be accomplished solely by reference to the agreement between the parties. It is only that agreement that is cited in the statute as the standard by which the damage cap is calculated. If Congress had intended the courts to import mitigation into that calculation, it provided no evidence of that intent in the statutory language it chose.

The Court acknowledges that some confusion exists in the case law. The Sixth Circuit case of *In re Highland Superstores, Inc.*, 154 F.3d 573 (6th Cir. 1998) stated

> The courts that have applied section 502(b)(6)'s framework for determining the allowable amount of a lessor's total rejection damage claim generally employ a four-step process. First, the court calculates the total rents due under the lease from the earlier of the date of filing or the date on which the lessor repossessed or the lessee surrendered the leased property. Second, the court determines whether 15% of that total is greater than the rent reserved for one year following the debtor's filing. Third, the 15% amount is compared to the rent reserved under the applicable lease for three years following the filing. Finally, the court, on the basis of the foregoing calculations, arrives at the total allowable amount of the landlord's rejection damages.

*Id.* at 577 (citing *In re Financial News Network, Inc.*, 149 B.R. 348, 351 (Bankr. S.D. N.Y. 1993); *In re Atlantic Container Corp.*, 133 B.R. 980, 989 (Bankr. N.D. Ill. 1991).[10] The

---

[10] Under this Court's interpretation of § 502(b)(6)(A), it would modify the *Highland* court's statement of the process. First, if the remaining term of the lease is 80 months or less, the court caps the landlord's damages claim at the amount of rent reserved in the lease for one year following the earlier of the petition date or the date the property was repossessed or surrendered plus delinquent pre-petition or pre-repossession rent. Second, if the remaining term of the lease is 240 months or greater, the court caps the landlord's damages claim at the amount of rent reserved in the lease for three years following the earlier of the petition date or the date the property was repossessed or surrendered plus delinquent pre-petition or pre-repossession rent. Finally, if the remaining term is greater than 80 months but less than 240 months, the Court calculates 15% of the remaining lease term and caps the landlord's damages claim at the amount of rent due under the lease for the resulting time period following the earlier of the petition date or the date the property was repossessed or surrendered plus delinquent pre-petition or pre-

(continued...)

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

*Highland* court speaks in terms of "the allowable amount of a lessor's total rejection damage claim." Thus, the method set out is for calculating only the "allowable amount," or § 502(b)(6) cap placed on the damages claim. It does not purport to mix the calculation of the total damages claim with the calculation of the cap. As if to underscore the separate nature of the two inquiries, the court says that "[t]he calculation of rejection damages as outlined above *assumes the existence of a claim*." *Id* (emphasis added).

The latter case of *In re Malease 14FK Corp.*, 351 B.R. 34 (E.D. N.Y. 2006), misquotes *Highland* – as does the Debtor's brief. The *Malease* court states

> The Sixth Circuit in *In re Highland Superstores, Inc.*, 154 F.3d 573, 577 (6th Cir. 1998), set forth a four step approach under the statute to calculate a lessor's claim "for damages resulting from the termination of a lease." 11 U.S.C. § 502(b)(6). First, by applying state law and the terms of the lease, the court calculates the total claim for damages due as of the earlier of the date of filing or the date on which the lessor repossessed or the lessee surrendered the property. *In re Highland Superstores, Inc.*, 154 F.3d at 577; *see also In re McSheridan*, 184 B.R. 91, 96 (B.A.P. 9th Cir. 1995) (explaining that damages are first determined under applicable state law). Second, the court determines whether 15% of that total is greater than the rent reserved for one year following the debtor's filing. Third, the 15% amount is compared to the rent reserved under the applicable lease for the three years following the filing. Finally, the court calculates the total allowable amount of the landlord's rejection damages, which is the greater of one year's rent or 15% of the total remaining rent, up to a maximum of three years. *Id*. (citations and footnotes omitted).

*In re Malease 14FK Corp.*, 351 B.R. at 41. The four step process set out in *Highland* is limited to calculation of the cap under § 502(b)(6)(A). By contrast, the *Malease* court includes calculation of the damages claim under state law as its step number one and in step number two it applies the 15% calculation to the damages claim. In this Court's opinion, the process set out in *Malease* finds no support in *Highland* notwithstanding the *Malease* court's citation to that case and it finds no support in the statutory language.

   *2. The Court's Calculation of the § 502(b)(6) Damages Cap*

Based on the stipulated facts, on the Lease between the parties, and on 11 U.S.C. § 502(b)(6), the Court calculates the cap on Lapis' damages claim as follows:

---

[10](...continued)
repossession rent.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

1. The remaining term of the lease from the petition date of January 12, 2009, through the Lease expiration on July 31, 2019, is 3,853 days.

2. Because that time period – just over 126 months – is greater than 80 months and less than 240 months, the Court calculates 15% of the remaining term to be 578 days from January 12, 2009, through August 12, 2010.

3. Base rent for the 578 day period equals $1,077,708.82 comprised of
   a. 20 days[11] from 1/12/2009 through 1/31/2009: $36,580.09
   b. 2/1/2009 through 7/31/2009 @$55,632.22/mo.: $333,793.32
   c. 8/1/2009 through 7/31/2010 @$57,023.02/mo.: $684,276.24
   d. 12 days from 8/1/2010 through 8/12/2010: $23,059.17

4. Expenses for the 578 day period equal $607,840.84 comprised of
   a. 1/12/2009 through 12/31/2009 @$1,041.54/day: $368,705.16
   b. 1/1/2010 through 8/12/2010 @$1,067.57/day:[12] $239,135.68

5. By totaling the above amounts, the Court finds that rent (base rent plus expenses) reserved under the Lease for 15% of the remaining term is $1,685,549.66.

---

[11] Based on annual rent divided by 365 days.

[12] The parties stipulated that actual operating expenses for 2008 were $106,010.24. Actual real estate tax expense for 2009 was $271,500.00. The Court projected operating expenses forward for 2009 at $108,660.60 and for 2010 at $111,377.01 by increasing operating expenses by 2.5% per year. This is consistent with the 2.5% annual rent increase agreed to by the parties in their Lease. The Court projected real estate taxes for 2010 at $278,287.50 by increasing the 2009 tax by 2.5%. The resulting total expense figures for 2009 are $380,160.50 and for 2010 are $389,664.51 or $1,041.54 and $1,067.57 per day respectively. Even if the language in § 502(b)(6)(A) could reasonably support calculation of a cap based on 15% of all of the rent reserved over the full lease term, this case highlights the difficulty of that approach. Leases, such as this one, that require reimbursement of the landlord's tax and maintenance expenses, are the norm in commercial leasing. This Lease runs for 12½ years and had a remaining term of 10½ years at the petition date. Any projection of those future expenses entails a degree of speculation but the farther into the future a court is asked to make the projection, the more speculative the numbers become. *See Kuehner v. Irving Trust Co.*, 299 U.S. 445, 454 (1937) (" It is well known that leases of business properties, particularly retail business properties, commonly run for long terms. The longer the term the greater the uncertainty as to the loss entailed by abrogation of the lease."). By reading the 15% term of § 502(b)(6)(A) consistently with the surrounding terms of that subsection, the Court projects those expenses only 19 months into the future rather than the full 10½ year remaining term.

ORDER ON OBJECTION TO CLAIM [87] FILED BY IBC DENVER IV, LLC
Case No. 09-10367 HRT

6. Unpaid pre-petition rent is $86,304.46.

7. Adding the rent due for 15% of the remaining Lease term and the unpaid pre-petition rent yields a total allowed claim of $1,771,854.12 under 11 U.S.C. § 502(b)(6).

### III. CONCLUSION

The remaining issues raised by the Debtor's objection to the Lapis claim are moot. They either go to the calculation of damages under state law or are issues that would only be of consequence if the Court were to find that the effect of the mitigation efforts could properly be taken into account in calculating the damages cap under § 502(b)(6).

In accordance with the foregoing discussion, it is

**ORDERED** that Debtor's *Objection to Claim [87] Filed by IBC Denver IV, LLC, Assigned to Lapis Advisers, LP* (Docket #857) is GRANTED IN PART and DENIED IN PART. Lapis' claim is limited under 11 U.S.C. § 506(b)(6) and allowed in the amount of $1,771,854.12.

Dated this  4th   day of January, 2012.

**BY THE COURT:**

_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court